# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FRONTFOUR CAPITAL GROUP LLC, and FRONTFOUR MASTER FUND, LTD., on behalf of themselves and similarly situated stockholders of MEDLEY CAPITAL CORPORATION, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2019-0100-KSJM |
| BROOK TAUBE, SETH TAUBE, JEFF TONKEL, MARK LERDAL, KARIN HIRTLER-GARVEY, JOHN E. MACK, ARTHUR S. AINSBERG, MEDLEY MANAGEMENT, INC., SIERRA INCOME CORPORATION, MEDLEY CAPITAL CORPORATION, MCC ADVISORS LLC, MEDLEY GROUP LLC, and MEDLEY, LLC | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 9, 2019
Date Decided: March 11, 2019
Date Revised: March 22, 2019

A. Thompson Bayliss, J. Peter Shindel, Jr., Daniel J. McBride, ABRAMS & BAYLISS LLP, Wilmington, Delaware; OF COUNSEL: Lori Marks-Esterman, Adrienne M. Ward, Nicholas S. Hirst, OLSHAN FROME WOLOSKY LLP, New York, New York; *Attorneys for Plaintiffs FrontFour Capital Group LLC and FrontFour Master Fund, Ltd.*

William M. Lafferty, John P. DiTomo, Daniel T. Menken, Aubrey J. Morin, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF

COUNSEL: Jason M. Halper, Nathan M. Bull, Adam K. Magid, Matthew M. Karlan, CADWALADER, WICKERSHAM & TAFT, LLP, New York, New York; *Attorneys for Defendants Brook Taube, Seth Taube, Jeff Tonkel, Medley Management Inc., MCC Advisors LLC, Medley Group LLC, and Medley LLC*.

Blake Rohrbacher, Kevin M. Gallagher, Kevin M. Regan, Nicole M. Henry, RICHARDS, LAYTON & FINGER, Wilmington, Delaware; OF COUNSEL: Matthew L. Larrabee, Paul C. Kingsbery, Shriram Harid, DECHERT LLP, New York, New York, Joshua D.N. Hess, DECHERT LLP, Washington, D.C.; *Attorneys for Defendant Sierra Income*.

Garrett B. Moritz, Eric D. Selden, S. Michael Sirkin, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; OF COUNSEL: Alan R. Friedman, Samantha V. Ettari, Jared I. Heller, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York; *Attorneys for Defendants Mark Lerdal, Karin Hirtler-Garvey, John E. Mack, and Arthur S. Ainsberg*.

**McCORMICK, V.C.**

Due to the press of time,[1] aspects of this decision lack polish or extended treatment.

March came in like a lion. Snow flurries and gray overcast covered downtown Wilmington for most of March's early days. The courthouse witnessed another flurry of activity during those days as the plaintiffs, FrontFour Capital Group LLC and FrontFour Master Fund, Ltd. ("FrontFour"), tried their expedited claims to enjoin transactions orchestrated by twin brothers Brook and Seth Taube.

The challenged transactions, which were announced on August 9, 2018, would combine an asset management firm founded and majority owned by the Taube brothers, Medley Management, Inc. ("Medley Management"), with two business development corporations that Medley Management advises, Medley Capital Corporation ("Medley Capital"), and Sierra Income Corporation ("Sierra"). If the transactions proceed, Sierra will acquire first Medley Capital and then Medley Management in two cross-conditioned mergers, with Sierra as the surviving

---

[1] This litigation commenced on February 11, 2019. The parties stipulated to an expedited schedule to accommodate a March 31, 2019 drop-dead date under the challenged merger agreements. Pre-trial briefs were submitted on Monday, March 4. Over 800 trial exhibits arrived in Chambers on Tuesday, March 5. Trial took place on March 6–7. On the second day of trial, the acquirer informed the Court that its "rights under the Merger Agreements will be eviscerated if the Court does not issue a decision on Plaintiffs' request for an injunction by 9 a.m. on Monday, March 11." Post-trial briefs were filed at 8 a.m. on Saturday, March 9. Daylight savings time began on Sunday, March 10, further depriving the Court of an hour and confirming Murphy's law.

combined entity (the "Proposed Transactions"). Medley Management will receive per share $3.44 cash, plus $.065 in cash dividends, and the right to receive .3836 shares of Sierra stock, which represents a premium of approximately 100% to Medley Management's trading price. The Taube brothers and their management team will receive lucrative employment contracts with the combined company. Medley Capital stockholders, including FrontFour, will receive per share the right to 0.8050 shares of Sierra stock, which provides no premium against Medley Capital's net asset value ("NAV").

The Taube brothers proposed the transactions in late June 2018. They touted size/scale, asset quality, and internalized management resulting from the transactions as beneficial to all of the parties. They set an aggressive timeline to permit announcement of a deal in early August 2018 in connection with the release of second-quarter financials. In response to the proposal, each of the three affiliated entities empowered a special committee to negotiate and, if appropriate, recommend the transaction. It was July 11th before the Medley Capital special committee had retained a financial advisor and was prepared to negotiate, leaving only a few weeks to negotiate under the Taube brothers' timeline. During that time, the Medley Capital special committee negotiated a slightly better exchange ratio, secured the Taube brothers' agreement to waive payments in connection with a valuable tax

2

receivable agreement ("TRA"), and obtained the opinion of an independent compensation expert that the Taube brothers' compensation packets were reasonable. The committee members also secured for themselves the agreement that two of the four of them—to be determined through an interview process following announcement of the Proposed Transactions—would serve on the board of the combined entity.

From a distance, this process appeared arm's-length. The December 2018 proxy recommending that the stockholders approve the Proposed Transactions certainly made it seem that way.

At trial, FrontFour proved otherwise. FrontFour commenced this litigation on February 11, 2019. They claimed that the Medley Capital directors, who include the Taube brothers, breached their fiduciary duties to the common stockholders by entering into the Proposed Transactions. They accused Sierra of aiding and abetting in those breaches. They also claimed that Medley Capital's public disclosures failed to provide several categories of information material to stockholders considering the Proposed Transactions.

In reality, when the Taube brothers proposed the transactions in June 2018, Medley Management was facing enormous financial pressure. Medley Management had engaged in two sales processes in 2017, both of which failed, which left merging

3

with affiliates as Medley Management's only solution. As part of the 2017 sales processes, Medley Management had secured standstill agreements from around thirty potential bidders, which prevented those third parties from proposing transactions with Medley Capital. During negotiations with one bidder during the 2017 sales process, the Taube brothers had already agreed to give up the TRA for substantially less consideration than they will receive under the Proposed Transactions. In 2018, Medley Management received two inbound expressions of interest for Medley Capital, which they ignored. The Medley Capital special committees did not know *any* of this information before this litigation. They were not told. They did not ask.

In the midst of this informational vacuum, Medley Capital's special committee members determined not to run any pre-signing market check or consider alternative transactions. They made this determination, although around that time at least one stockholder was agitating for Medley Capital to engage in a sales process. They capitulated to the aggressive timeline, although Medley Capital had no business reasons for rushing toward a deal. Then, they insulated the deal from a post-signing market check by agreeing to deal protections, including a no-shop.

This post-trial decision finds that the Proposed Transactions trigger the entire fairness test. FrontFour proved that half of the Medley Capital special committee

was beholden to the Taube brothers, and thus the Taube brothers dominated and controlled the board with respect to the Proposed Transactions. Defendants failed to meet their burden of proving that the Proposed Transactions are entirely fair. The deal protections of the merger agreement also fail enhanced scrutiny.

As relief, FrontFour seeks a curative shopping process, devoid of Medley Management's influence, free of any deal protections, plus full disclosures. One obstacle prevents the Court from issuing this relief: FrontFour failed to prove that the acquirer, Sierra, aided and abetted in the other defendants' breaches of fiduciary duties. Under the Delaware Supreme Court's decision in *C & J Energy*,[2] an injunction may not issue if it would "strip an innocent third party of its contractual rights" under a merger agreement, unless the party seeking the injunction proves that the third party aided and abetted a breach of fiduciary duty by the target directors. Ordering a go-shop despite the no-shop and preventing enforcement of the deal protections would effectively strip Sierra of its contractual rights.

And so, what came in like a lion goes out like a lamb: Under *C & J Energy*, FrontFour's requested relief must be denied.

---

[2] *C & J Energy Servs., Inc. v. City of Miami Gen. Empls.' and Sanitation Empls.' Ret. Tr.*, 107 A.3d 1049, 1071–72 (Del. 2014).

Medley Capital's stockholders, however, are entitled to corrective disclosures. The proxy creates the misleading impression that the special committee replicated arm's-length negotiations amid the conflicts tainting the Proposed Transactions. To vote on an informed basis, the stockholders must know the reality—that the majority of the members of the special committee failed to act independently when negotiating the Proposed Transactions. Further, the stockholders are entitled to additional disclosures concerning third-party expressions of interests. On this topic, disclosures to date have been incomplete or, in one instance, outright false. Any stockholder vote on the Proposed Transactions is enjoined pending corrective disclosures consistent with the matters discussed in this decision.

## I. FACTUAL BACKGROUND

Trial took place over one and three-quarter days. The record comprises over 800 trial exhibits, live testimony from six fact and two expert witnesses, deposition testimony from five fact witnesses, and ninety-seven stipulations of fact.[3] The

---

[3] The Factual Background cites to: docket entries (by docket "Dkt." number); trial exhibits (by "JX" number); the trial transcript ("Trial Tr."); and stipulated facts set forth in the Parties' Pretrial Order (Dkt. 128) ("PTO"). The parties called by deposition John Mack, Russ Hutchinson on behalf of Goldman Sachs, John Simpson on behalf of Broadhaven, Jeffrey Young on behalf of Origami, and Thomas Surgent on behalf of NexPoint. The transcripts of their respective depositions are cited using the witnesses' last names and "Dep. Tr." (*e.g.*, "Mack Dep. Tr.").

parties submitted pre-trial and post-trial briefs. These are the facts as I find them after trial.

## A. The Taube Brothers, the Medley Entities, and Medley Capital

Each of the entities named as a defendant in this action is an affiliate of Medley Management, a publicly traded asset management firm formed by Brook and Seth Taube. Brook, Seth, and their younger brother, Chris, control Medley Management through majority ownership.[4] Medley Management is the parent entity of several registered investment advisors, which manage several funds, including Medley Capital and Sierra (collectively, the "Medley Entities"). The Medley Entities' organizational structure is reflected in the attached chart.[5]

Medley Capital is a business development corporation ("BDC") formed by the Taube brothers in 2011.[6] BDCs are special investment vehicles regulated under the Investment Company Act of 1940 (the "'40 Act") and designed to facilitate

---

[4] The three Taube brothers own about 82% of Medley Group LLC. Trial Tr. at 311:17–312:11 (Taube). Medley Group LLC, in turn, owns 97.7% of Medley Management. *Id.* at 321:12–14.

[5] *See* Dkt. 136, Ex. A: PDX 001. This decision refers to a number of demonstratives that summarize the record evidence and were publicly filed by the parties. Referring to charts has the added bonus of appealing to the visual learner. The Charts need a cipher, as this decision uses different defined terms to refer to each of the Medley Entities to improve readability: MDLY = Medley Management; MCC = Medley Capital; SIC = Sierra.

[6] PTO ¶¶ II.3, II.5.

capital formation for small and middle-market companies.[7]   Medley Capital describes its business as "generat[ing] income and capital appreciation by lending directly to privately held middle market companies . . . ."[8] Medley Capital "source[s] investment opportunities through direct relationships with companies, financial intermediaries . . . , as well as through financial sponsors."[9]   Medley Capital launched its initial public offering in 2011.[10]

Medley Capital licenses its name from the Medley Entities.[11]  Medley Capital has no employees, offices, or physical assets of its own; all of this is supplied by its external advisor, MCC Advisors LLC ("Advisors"), a Medley Management subsidiary.  The Medley Entities experience total insider overlap.  Every member of Medley Capital's management team holds management positions, and each of

---

[7] *See generally* U.S. Securities and Exchange Commission, *Fast Answers: Investment Company Registration and Regulation Package*, available at https://www.sec.gov/investment/fast-answers/divisionsinvestmentinvcoreg121504htm.html#P75_10439 (last visited Mar. 7, 2019); Morrison Foerster, *FAQs About BDCs*, https://media2.mofo.com/documents/faq-business-development-companies.pdf   (last visited Mar. 11, 2019). *See also* Medley Capital Corp., Annual Report (Form 10-K) at 30 (Feb. 14, 2018) ("We are classified as a non-diversified investment company within the meaning of the '40 Act, which means that we are not limited by the '40 Act with respect to the proportion of our assets that we may invest in securities of a single issuer.").

[8] JX 013 at p.4.

[9] *Id.*

[10] PTO ¶ II.21.

[11] JX 051 at p.23.

Medley Capital's inside directors hold board seats in other Medley Entities, including Medley Management, Advisors, and Sierra.[12]

Advisors manages Medley Capital pursuant to an Amended and Restated Investment Management Agreement (the "Management Agreement") dated January 19, 2014.[13] Under that agreement, Medley Capital pays Advisors a base management fee of 1.75% of Medley Capital's gross assets and a two-part incentive fee calculated from net investment income ("NII") and net capital gains.[14] Advisors has broad discretion in making investment decisions and directing Medley Capital's rights under its debt instruments.[15] Such external management arrangements are common among BDCs.[16]

---

[12] *See* Dkt. 136, Ex. A: PDX 005 ("Medley Entities: Overlapping Management & Directors").

[13] JX 004. Advisors provides Medley Capital's office facilities, equipment, and other administrative services to Medley Capital pursuant to a separate administration agreement. PTO ¶ II.23; JX 051 at p.23. For the years ended September 30, 2017, 2016, and 2015, Medley Capital paid Advisors $3.8 million, $3.9 million, and $4.1 million, solely for administrative expenses, respectively. *Id.*

[14] PTO ¶ II.24; JX 004 § 8.

[15] Trial Tr. at 313:17–315:23 (Taube testimony). "We [Advisors] make the loans on behalf of Medley Capital . . . as the manager, we manage all aspects of the loan from inception through to repayment, and the board isn't involved in how we process the loan at any time." *Id.* at 315:7–14.

[16] *See* Trial Tr. at 417:22–418:5 (Hirtler-Garvey).

Under the '40 Act, a majority of Medley Capital's board of directors (the "Board") must be independent, and Medley Capital cannot enter into any transaction with its external advisor without the approval of a majority of its independent directors.[17] Medley Capital has a seven-member Board divided into three classes.[18] The directors are elected by a plurality vote and serve staggered three-year terms.[19] Medley Capital's current Board comprises three inside directors and four independent directors.[20] Medley Capital's inside directors are Brook Taube, Seth Taube, and their friend of thirty years, Jeff Tonkel.[21] Medley Capital's outside directors are John E. Mack, Karin Hirtler-Garvey, Arthur S. Ainsberg, and Mark Lerdal.[22] Mack, Hirtler-Garvey, and Ainsberg joined the Board in 2011.[23] Lerdal joined the Board in 2017.[24]

---

[17] *See* 15 U.S.C. § 80a-56; JX 430 at p.14.

[18] Medley Capital Corp., Registration Statement Amendment (Form N-2/A) (Nov. 23, 2010), Ex. 99.A.3 ("Medley Capital Certificate of Incorporation") § 6.3; *Id.*, Ex. 99.B.3 ("Medley Capital Bylaws") § 3.1 ("The number of directors which shall constitute the whole of the Board of Directors shall be seven.").

[19] Medley Capital Certificate of Incorporation § 6.3.

[20] Medley Capital Corp., Annual Report (Form 10-K) at 72 (Dec. 4, 2018).

[21] PTO ¶¶ II.4–6; Medley Capital Corp., Annual Report (Form 10-K) at 72 (Dec. 4, 2018); Trial Tr. at 318:12–16 (Taube testifying that he has known Tonkel since college).

[22] PTO ¶¶ II.7–10.

[23] *Id.* ¶¶ II.7–9.

[24] *Id.* ¶ II.10.

Under the '40 Act, Medley Capital's independent directors must annually review and, if appropriate, approve its Management Agreement.[25] In the approval process, the outside directors confer with counsel and review management fee levels of other BDCs.[26] Under the '40 Act, the Management Agreement must be terminable at will on 60 days' notice without a termination fee.[27] The outside directors have never considered Advisors' performance[28] or threatened (or even considered threatening) to terminate the Management Agreement as part of their annual review or otherwise.[29]

In sum, Medley Capital depends on the Taube brothers for its day-to-day operations, office space, office equipment, staff, and even its name. Medley Capital has the right to terminate Advisors' Management Agreement, but has never

---

[25] 15 U.S.C. § 80a-15(a)(2).

[26] Trial Tr. at 163:10–21 (Ainsberg); Mack Dep. Tr. at 40:21–41:9.

[27] *Id.* § 80a-15(a)(3); PTO ¶ II.23; *see* Trial Tr. at 286:20–287:2 (Taube); *id.* at 162:24–163:21 (Ainsberg).

[28] Trial Tr. at 197:11–14 (Ainsberg) ("Q. . . . [T]he Medley Capital board has never considered declining to renew Medley Capital Advisors' contract due to poor performance, has it?  A. It has not.").

[29] Mack Dep. Tr. at 43:10–12 ("Q: Has the Board ever considered terminating the investment management agreement?  A: Not that I'm aware of."); Trial Tr. at 197:11–14 (Ainsberg) ("Q: . . . [T]he Medley Capital board has never considered declining to renew Medley Capital Advisors' contract due to poor performance, has it?  A. It has not."); *id.* 390:1–5 (Hirtler-Garvey) ("Q: Now, did you ever discuss with your special committee members or with the other independent directors of the board, I guess, terminating that contract?  A. We have not.").

11

considered using that right. Termination of that agreement would not extricate Medley Capital from the Taube brothers' influence in any event, given the other points of overlap.

Another salient fact: None of Medley Capital's fiduciaries (officers and directors) have interests aligned with the interests of Medley Capital's common stockholders.

As to the inside directors and management, their financial interests lie in Medley Management,[30] although the Taube brothers beneficially own just under 15% of Medley Capital's common stock.[31] If the Proposed Transactions close, the Taube brothers and Tonkel will each receive compensation for their Medley Management interests, as well as lucrative compensation packages more secure than the at-will Management Agreement.[32]

---

[30] The Taube brothers have close to a 100% ownership interest in Management. *See* PTO ¶ II.5 ("Seth Taube, with Brook Taube, is the beneficial owner of . . . 97.7% of the voting interests in [Medley Management] common stock"); PDX 001. Tonkel owns 6% of the units in Medley LLC, which are exchangeable for shares of MDLY Class A stock. PTO ¶ II.6.

[31] PTO ¶ II.5 ("Seth Taube, with Brook Taube, is the beneficial owner of 14.6% of Medley Capital common stock"); Trial Tr. at 281:19–21 (Taube) ("Management and Medley [Management] have, in combination, approximately 14.9 percent interest in Medley Capital Corporation shares.").

[32] Under the terms of the Proposed Transactions: Brook Taube will be Chairman and CEO of the combined company, receive an annual base salary of $600,00, and be eligible for additional performance-based compensation of $1,200,00 cash and $2,000,000 in restricted shares; Seth Taube will be Vice Chairman, Senior Executive Vice President, and Senior

As to the outside directors, the value of their director fees dwarfs the value of their Medley Capital common stock.[33] Ainsberg, Hirtler-Garvey, and Mack have each been paid over $1 million for serving on the Board and its committees.[34] For the company's fiscal year ending September 30, 2018, Ainsberg earned $299,000 as a Medley Capital director, representing roughly half of his 2018 income.[35] Lerdal

---

Managing Director of the combined company, receive an annual base salary of $480,000, and be eligible for additional performance-based compensation of $600,000 in cash and $1,150,000 in restricted stock; and Tonkel will be President, receive an annual base salary of $480,000, and be eligible for additional performance-based compensation of $600,000 cash and $1,150,000 in restricted stock. PTO ¶¶ II.69–71.

[33] Ainsberg owns only 3,000 shares of Medley Capital stock, which he purchased shortly after joining the Medley Capital Board (JX 001); Hirtler-Garvey owns only 3,000 shares of Medley Capital stock, which were purchased shortly after the IPO (JX 003); Mack owns only 1,000 shares of Medley Capital stock, which were purchased in 2012 (JX 002); and Lerdal does not own any shares of Medley Capital stock. None of them have elected to receive Medley Capital stock in lieu of cash compensation since 2011, and none of the independent directors have acquired shares in Medley Capital since 2012. JX 1–JX 3; JX 417 at p.559.

[34] Each independent director receives an annual fee of $90,000. Medley Capital Corp., Annual Report (Form 10-K) at 78 (Dec. 4, 2018). In addition, Chairman of the Audit Committee receives an annual fee of $25,000, and chairpersons of the Nominating, Corporate Governance, and Compensation Committees receive annual fees of $10,000. *Id.* Other members of the Audit Committee, the Nominating and Corporate Governance Committee, and the Compensation Committee receive annual fees of $12,500, $6,000, and $6,000, respectively. Each independent director on the special merger committee received a one-time retainer of $25,000, the chairman of the special committee receives a monthly fee of $15,000 and other members receive a monthly fee of $10,000. *Id.* For Medley Capital's fiscal year ending on September 30, 2018, Ainsberg received $299,000, Hirtler-Garvey received $267,500, Mack received $275,000, and Lerdal received $252,500. *Id.*

[35] JX 622 at pp.7–11.

has been paid $288,702 for his two years as Medley Capital director.[36]  By contrast,

at the deal price, the value of all of the outside directors' combined common stock

is under $40,000.[37]  In the Proposed Transactions, two of Medley Capital's four

outside directors will serve on the Board of the combined company; all four outside

directors interviewed for the position after the Merger Agreement was signed.[38]

## B. Pre-Signing Events

### 1. Medley Management's Failed Sales Processes

Since its January 20, 2011 IPO, by every industry measure, Medley Capital

has been in a steady financial decline.[39]  This decline occurred during a period of

---

[36] Medley Capital Corp., Proxy Statement (Form DEF 14A), Proposal I (Dec. 21, 2017) (reporting compensation of $36,202 for fiscal year ending Sept. 30, 2017); Medley Capital Corp., Annual Report (Form 10-K) at 78 (Dec. 4, 2018) (reporting compensation of $252,500 for the fiscal year ending September 30, 2018).

[37] Seven thousand shares x $5.68 per share.  JX 700, Medley Capital Corp., Proxy Statement (Form DEFM14A) (Dec. 21, 2018) ("Medley Capital Proxy").

[38] Mack Dep. Tr. at 102:2–14; Trial Tr. at 387:15–23; JX 379 at p.1.

[39] *See* Dkt. 118, Pls.' Pretrial Br. at 17, Chart & n.3 (compiling data).  Between its IPO and the announcement date of the challenged transactions, Medley Capital's stock plummeted by approximately 72% and its cumulative return was -34%.  JX 507 at p.7.  The deterioration in Medley Capital's net investment income ("NII"), a key metric in measuring BDC performance and a proxy for BDC earning power, and dividend are particularly dramatic.  Since 2014, NII has plunged by 85% (from $1.58 to $0.23 per share), and the dividend has fallen by 65% (from $1.48 to $0.52 per share).  JX 443 at p.8; Trial Tr. at 194:4–12 (Zenner).  Because dividends have exceeded NII, Medley Capital has operated with an unsustainable shortfall since 2016. *Id.*

sustained stock market and sector share price increases.[40]  Medley Capital's

performance is poor compared to its peers.[41]  Due to Medley Capital's poor financial

performance,[42] Medley Management faced financial pressures.[43]

In May 2017, Medley Management embarked on a process to consider a range

of strategic transactions.[44]  Medley Management retained UBS and Credit Suisse to

---

[40] JX 509 at p.7.

[41] The S&P BDC Index has had a positive 57% return since 2011.  JX 443 at p.3; Trial Tr. at 469:23–470:2 (Zenner) (testifying that Medley Capital's performance had been poor relative to its peers).  As of August 9, 2018, Medley Capital had the largest discount to NAV (53%) of any BDC.  JX 343 at p.33.  As of year-end, Medley Capital has continued to languish at a 55% discount to NAV—the single largest NAV discount among the 46 BDCs covered by Raymond James' investment banking group in their "BDC Weekly Insight" report (published January 3, 2019) and nearly 3x the BDC average discount of 19%.  JX 434 at p.7.

[42] At the end of 2017, the Management Agreement appears to have accounted for 21% of Medley Management's fee-earning assets under management ("fee earning AUM" or "FEAUM").  Medley Management, Inc., Annual Report (Form 10-K) at 52–53 (Mar. 29, 2018).  FrontFour quantifies the Management Agreement as producing about 30% of Medley Management's fee revenue.  JX 443 at p.10.  Whichever way one computes the value of the Management Agreement to Medley Management, it is clearly significant.

[43] Between 2016 and 2017, base management fees paid to Medley Capital Advisors fell from $19.5 million to $17.8 million.  JX 051.  The incentive fee had fallen from $8.0 million to $0.9 million in the same period, and Advisors was likely to lose all of its incentive fees from Medley Capital in 2018.  JX 051 at F-51.

[44] *Id*. at 288:17–289:22; PTO ¶ II.27; Medley Capital Proxy at 57.  Medley Management internally referred to this process as "Project Redwood."  JX 027 (Project Redwood Management Presentation).

conduct outreach.[45]   Nineteen parties expressed interest and seven executed

confidentiality agreements, but the process ultimately failed.[46]

In October 2017, Medley Management determined to restart the process and

reach out to potential bidders.[47]   Medley Management retained Goldman Sachs &

Co. LLC ("Goldman") and Broadhaven Capital Partners, LLC ("Broadhaven").[48]

They invited thirty-eight potential strategic partners to participate in the preliminary

round of a two-round sale process.[49]   Twenty-four of them executed confidentiality

---

[45] PTO ¶ II.27.

[46] *Id.*; Medley Capital Proxy at 57–58.  On July 2017, two interested parties submitted non-binding bids, but neither bid progressed beyond the initial indication of interest.  PTO ¶ II.30; JX 621 (Pls.' Expert Report of Dr. Kennedy) at ¶ 26 ("one cash proposal included an acquisition of [Medley Management] and [Advisors], and the other proposed a combination in exchange for consideration of cash and stock of the combined entity"); Medley Capital Proxy at 57 ("In July 2017, two of the interested parties submitted non-binding bids to acquire [Medley Management] and [Advisors].  One of the interested parties proposed an acquisition of [Medley Management] and [Advisors] for cash, and the other proposed a combination in exchange for consideration of cash and stock of the combined entity.  However, neither bid progressed beyond the initial indication of interest.").

[47] Medley Management referred to this process internally as "Project Elevate."  *See* JX 029 (Project Elevate: Confidential Information Packet).  The relevant record materials are: *id.*; JX 068 (Project Elevate: January 2018 Discussion Materials); JX 635 (Project Elevate: Apr. 2018 Process Summary); JX 639 (Project Elevate: July 2018 Process Summary); JX 646 (Project Elevate: Deal Point List); JX 035 (Project Elevate: Oct. 2017 Discussion Materials); JX 047 (Project Elevate: First Round Bid Summary Materials); JX 064 (Project Elevate: Discussion Materials); JX 205 (Project Elevate: July 2018 Process Updates).

[48] JX 054 (letter engaging Goldman "as financial advisor in connection with the possible sale of all or a portion of [Medley Management]"); Medley Capital Proxy at 58.

[49] JX 085.

agreements.[50] Medley Management received three "viable" first-round, non-binding indications of interest.[51] Only one bidder, "Party X," made a second-round proposal.[52] From January 12, 2018, through January 24, 2018, Medley Management and Party X engaged in negotiations and exchanged numerous proposals and counterproposals.[53]

The confidentiality agreements executed by third parties in Medley Management's two sales processes prevented the third-parties from offering to enter into any transaction with funds managed by Medley Management, including Medley Capital.[54] These restrictions applied for a "standstill period" following execution of the agreements. The standstill periods ranged from twelve to twenty-four months.[55]

---

[50] Medley Capital Proxy at 58.

[51] *Id.*

[52] JX 057; JX 635 at p.3.

[53] Medley Capital Proxy at 58.

[54] They prevented the third parties from offering to acquire or be involved in "any acquisition, transaction, merger or other business combination relating to all or part of . . . any funds advised by [Medley Management] or acquisition transaction for all or part of the assets of . . . any funds advised by [Medley Management]." PTO ¶ II.28; *see, e.g.*, JX 037 (Schroders Conf. Agr.) § 10.a. The agreements also restricted the third parties' ability to "encourage, initiate, induce or attempt to induce [Medley Capital] . . . to terminate, amend or otherwise modify their advisory agreements with [Medley Management] during the Standstill Period." PTO ¶ II.29. *See, e.g.*, Schroders Conf. Agr. § 10.h.

[55] *See* Dkt. 136, PDX 006 (Summary: Standstill Periods); *id.* PDX 007 (Summary: Standstill Periods, cont.).

On January 26, 2018, the Medley Capital Board convened a meeting to receive updates on Medley Management's sales process.[56] Brook Taube reported on the process as well as the status of negotiations with Party X.[57] His report to the Board was high-level. It omitted information that he had presented to Medley Management's board of directors that same day.[58] The Board was not informed, for example, that the arm's-length parties were only willing to pay premia of 8.4% (one third-party) – 30.0-55.4% (Party X). They were not told that Party X had dropped its price due to concerns about the performance of Medley Management. They were not made aware of the standstill provisions restricting transactions at Medley Capital. Before this litigation, none of the Board members ever asked for or were made aware of this information.

If consummated, Party X's proposal would result in a change of control of Medley Management, triggering Medley Capital's approval rights under the

---

[56] JX 065 at p.1.

[57] *Id.* at pp.1–2.

[58] *Compare* JX 067 (including half-page summary of the Goldman process and background on Party X) *with* JX 068 (including comprehensive information about the Medley Management bidding process, the terms of each bid, and financial terms proposed by Party X).

Management Agreement.[59] To consider the impact of the Party X proposal on Medley Capital,[60] the Board determined to establish a special committee.[61] The Board appointed to the committee Ainsberg, Hirtler-Garvey, Mack, and Lerdal, with Ainsberg as chair (the "Special Committee").[62] The committee retained Kramer Levin as legal advisors.[63]

On March 15, 2018, Party X submitted a revised bid that reduced the proposed purchase price significantly and changed other important terms.[64] Medley Management determined that the revised proposal was not in the best interests of Medley Management and terminated discussions.[65] On May 2, 2018, Party X

---

[59] JX 065 at p.2 (Jan. 26, 2018 Medley Capital Board meeting minutes, Brook reported that the contemplated transaction "would result in a change in control due to the fact that [Medley Capital's] investment advisory agreement would be assigned to [Party X].").

[60] Trial Tr. at 293:13–24 (Taube) ("You know, when the determination was made to proceed with [Party X], we identified that, due to the assignment of the contract, that that was a decision that needed to be made. My recollection is that [the] special committee was formed so that they could make that decision and determination on their own without the interested board members.").

[61] JX 065 at pp.2–4.

[62] *Id.*

[63] *Id.* at p.5. The Medley Capital Board approved a $25,000 retainer for each committee member, a stipend of $15,000 per month for the committee chair, and a stipend of $10,000 per month for all other members. *Id.*

[64] JX 087; Medley Capital Proxy at 59; JX 635 at p.5.

[65] PTO ¶ II.40; Medley Capital Proxy at 59.

informed Medley Management that it did not intend to continue to pursue a potential transaction.[66]

In April 2018, a third-party, Origami Capital Partners, LLC ("Origami"), reached out to Medley Capital several times to propose a potential transaction.[67]  On April 4, 2018, Origami submitted an indication of interest.[68]  Medley Capital publicly denied ever receiving that letter.[69]  But Origami addressed the April 2018 letter to both Brook Taube and Marilyn Adler, a Medley Capital Senior Managing Director.[70]  And Adler *responded* to the letter: "I am excited to tell you that Medley has agreed to discuss a process for the sale.  I've given your name as a possible buyer.  I am having a discussion this week and will update you as I know more."[71]  Brook Taube still maintains:  "It's not clear to me where the mysterious

---

[66] PTO ¶ II.41.

[67] JX 101; JX 107.

[68] JX 544.

[69] Medley Capital Corp., Current Report (Form 8-K) at 1 (Feb. 13, 2019) ("Contrary to Origami's public statements, the Company never received a proposal to buy the SBIC Subsidiary from Origami until yesterday.").

[70] JX 100.  Origami addressed the letter to Adler because it believed at the time that Adler was *instructed* to solicit expressions of interest to purchase Medley SBIC.  Young Dep. Tr. at 78:6–7.  Knowing that Brook and Adler worked together, Origami contacted the two of them.  *Id.* at 77:13–15.  Origami was "surprised and disappointed that [Brook] refused to respond." *Id.* at 77:16–18.

[71] JX 108.

correspondence came from."[72] Before this litigation, the Special Committee was not aware of Origami's 2018 overtures.

As part of Medley Management's negotiations with Party X, the Medley Entities' founders (the Taube brothers and other executives) agreed to give-up their TRA,[73] which was worth approximately $5.9 million for fifteen years following Medley Management's IPO.[74] Before this litigation, the Special Committee was not informed of Medley Management's negotiations with Party X concerning the TRA.

### 2. Medley Management's Proposed Transactions with Medley Capital and Sierra

By May 2018, Brook Taube felt that Medley Management was "under enormous pressure" financially.[75] Wells Fargo noted that Medley Capital's "NAV has dropped for a remarkable fifteen quarters,"[76] and observed Medley Capital's

---

[72] Trial Tr. at 373:22–374:1.

[73] For some background on TRAs, see Lynnley Browning, *Squeezing Out Cash Long After the I.P.O.*, New York Times (Mar. 13, 2013), *available at* https://dealbook.nytimes.com/2013/03/13/private-equity-squeezes-out-cash-long-after-its-exit/ (last visited Mar. 9, 2019).

[74] Trial Tr. at 246–47 (Sterling).

[75] JX 126 (May 9, 2018 email from Brook Taube).

[76] JX 078 (Wells Fargo Equity Research Report, *Medley Capital: We Were Wrong, But Staying the Course* (Feb. 6, 2018)); *see also* JX 618 (Defs.' Expert Report of Dr. Zenner) at p.56.

"severe underperformance."[77]   In Mack's words, by May 2018, Medley Capital's credit portfolio was "bottoming out."[78]   The management team faced fee waivers at Medley Capital[79] and NAV issues "across the board," which would have a "meaningful impact on [Medley Management]."[80]

Intensifying this pressure, in 2016, the Taube brothers caused Medley LCC, a subsidiary of Medley Management, to a Master Investment Agreement with affiliates of Fortress Credit Advisors, LLC ("Fortress").   Under the agreement, Fortress provided approximately $40 million in capital for Medley Capital projects. Fortress received a put right that, if exercised, forces Medley to "immediately redeem" Fortress's interest.[81]   This put right can be triggered in if Medley LLC fails to pay Fortress a preferred distribution or if Medley ceases to control Advisors.[82]

---

[77] JX 129 (Wells Fargo Equity Research Report, *Medley Capital: When the Going Gets Tough . . .* (May 10, 2018)); *see also* JX 618 (Defs.' Expert Report of Dr. Zenner) at p.58.

[78] Mack Dep. Tr. at 61:16–25.

[79] On May 4, 2018, Medley Capital Advisors voluntarily elected to waive $380,000 of the base management fee payable for the quarter ended March 31, 2018.  JX 417 at p.16.

[80] JX 126 at p.1.  Trial Tr. at 287:18–23 (Taube) ("[W]e were under pressure.  And by that I mean, we were not going to make the quarter.  And I think on any quarter, we're doing our best to make the earnings that we are targeting.  In this quarter, as I recall, a few hundred thousand dollars was the difference.").

[81] *Id.* § 6.3.

[82] *Id.* § 6.2.

Brook Taube proposed implementing drastic steps, including closing Sierra Total Return Fund[83] to boost cash flow, ending the Sierra distribution to gain $4 million in EBITDA, and imposing other cost saving initiatives to squeeze another $2 million out of the business.[84] On May 9, 2018, Brook even requested that two of his senior management members agree to defer cash payments owed to them and take Medley Management stock instead.[85] His colleagues declined.[86] Before this litigation, the Special Committee was unaware of the pressures Medley Management faced during this time period.[87] In a candid moment during trial, Ainsberg admitted that he wished he had known.[88]

As one solution, the Taube brothers and their team began to contemplate a three-way combination between Medley Management, Medley Capital, and Sierra. Sierra is a non-traded BDC specializing in first lien, second lien, and subordinated debt of middle market companies with annual revenue between $50 million and $1

---

[83] "[A]nother [investment] vehicle that was intended and still does follow in the tracks of [Sierra]." Trial Tr. at 282:14–17.

[84] *See* JX 119.

[85] JX 126 (May 9, 2018 email from Brook Taube).

[86] JX 701; JX 133.

[87] Trial Tr. at 215–17 (Ainsberg), 287–88 (Taube).

[88] *Id.* at 215:18–217:2.

billion.[89]   Like Medley Capital, Sierra is externally managed by a Medley Management subsidiary.[90]   Sierra is much larger than Medley Capital.   As of September 30, 2018, Sierra had total net assets of $687,862,000 and a NAV per share of $7.05.[91]

Internally, Medley Management referred to this new proposal as "Project Integrate."[92]   Brook Taube had conceived of this transaction in March 2018 as a fallback to the Party X deal.[93]   By May 21, 2018, Project Integrate was at the top of the list of alternatives, and the management team was "very supportive."[94]   By May 30, 2018, Brook Taube had asked Goldman and Broadhaven to consider the proposed three-way combination.[95]

At Sierra and Medley Capital board meetings on June 18 and 19, 2018, respectively, Medley Management formally introduced the idea of the three-way

---

[89] PTO ¶ II.12; JX 656.

[90] Medley Capital Proxy at 21.

[91] *Id.* at 360.

[92] *See* JX 091; JX 092.

[93] JX 092 (Mar. 29, 2018 email from Brook: "I like project integrate / Let's see if we can defer recapture and tax . . . and keep TRA / That would be good :-)").

[94] *See* JX 134.

[95] JX 140.

combination.[96] The initial proposal was that each share of Medley Capital stock would be converted into the right to receive 0.76 shares of Sierra common stock. Sierra would acquire Medley Management for $3.75 in cash and 0.41 shares of Sierra common stock.[97]

The minutes of the January 19, 2019 Board meeting summarize Medley Management's rationale behind the proposed transaction.[98] In sum, the major

---

[96] JX 162; JX 163; JX 164.

[97] JX 164.

[98] Those minutes state: "[T]here was an industry-wide push for increased scale, . . . potential benefits of increased scale include better financing options, investment opportunities, and cost savings, among other benefits. In particular, by scaling the institutional manager, [the combined company, "Newco"] would be able to commit capital for investments alongside strategic partners and other institutional investors. He also pointed out that the Potential Transaction would create a streamlined organizational structure allowing for significant reductions in fixed costs and expenses. In addition, following the Potential Transaction, Newco would experience increased scale and liquidity. Newco would have approximately $1.2 billion in assets and would be the second largest internally managed [BDC] and the seventh largest BDC overall. Discussion ensued among members of the Board. Mr. Taube further noted that compared to externally managed BDCs, internally managed BDCs traded at a substantial market premium to book, or net asset value, and that issuing shares while trading at a premium would in and of itself be accretive. Mr. Taube emphasized, however, that it is not possible to precisely predict how the market would react to the Potential Transaction." JX 164 at p.2.

At this point, it bears noting that none of the Board or Special Committee meeting minutes from June 2018 forward were finalized until after FrontFour commenced this litigation. Trial Tr. at 419:2–16 (Hirtler-Garvey); JX 293. For that reason, I do not view them as contemporaneous evidence or give them any presumptive weight, but rather use them to summarize Defendants' litigation position.

benefits of the proposed transaction touted by the transaction's proponents are: increased scale, increased liquidity, diversified asset pool, and internalization.[99]

Of course, the Proposed Transactions posed significant conflicts. In an effort to simulate arm's-length dealings, each of the three entities empowered a special committee to negotiate and, if appropriate, approve the transaction. Like Medley Capital, Sierra had formed a special committee in January 2018 to consider the impact of the Party X transaction;[100] the committee had been in a holding pattern since that time. Each of the committees hired financial advisors. Medley Management hired Barclays Capital Inc. ("Barclays");[101] Medley Capital hired Sandler O'Neill + Partners, L.P. ("Sandler"), as discussed below; and Sierra hired Broadhaven.

Brook Taube facilitated the Sierra special committee's retention of Broadhaven. He thought highly of Broadhaven's Todd Owens,[102] having known

---

[99] JX 163 at p.7 (June 19, 2018 Medley Capital Board Presentation); Medley Capital Proxy at 26; JX 618 ¶ 25; Trial Tr. at 295:8–297:12 (Taube).

[100] Medley Capital Proxy at 71 ("[O]n January 26, 2018, [Medley] Management held meetings with the Medley Capital Board and the Sierra Board . . . [the] Sierra Board established . . . the Sierra Special Committee . . . and authorized the committee[] to evaluate the merits of a potential sale of substantially all of [Advisors'] assets to Party X . . . .").

[101] PTO ¶ II.53. The decision to engage Barclays was made at the July 10, 2018 meeting of the Medley Management special committee. JX 204 at p.2.

[102] Trial Tr. at 349 (Taube).

him for years.[103]  However, Medley Management had determined to retain Goldman only for Project Integrate—"two fees on the Integrate didn't make sense."[104]  So, Brook Taube agreed to introduce Broadhaven to the Sierra special committee,[105] even though Broadhaven was still engaged by Medley Management.[106]  Brook Taube suggested the idea to Tonkel on June 6, 2018.  Broadhaven terminated its engagement with Medley Management on June 16, 2018, and pitched the Sierra special committee on June 18, 2018.[107]  The Sierra special committee formally retained Broadhaven on June 29, 2018.[108]  Although Broadhaven terminated its Medley Management engagement without receiving any payment, the Sierra special committee agreed to make an up-front payment of $1 million, the same amount Broadhaven would have earned as a transaction fee if the Medley Management strategic process had concluded successfully.[109]

---

[103] *Id.* at 348.

[104] *Id.* at 301; *see also id.* at 349 ("We had made the decision only to pay Goldman going forward.").

[105] *Id.*

[106] Trial Tr. at 300:21–301:3 (Taube) (B. Taube giving reasons for recommending Broadhaven to the [Sierra] special committee); JX 151 (June 13, 2018 email from B. Taube telling Broadhaven that they were "on deck" to pitch on June 18, 2018).

[107] JX 158; JX 151; JX 162.

[108] JX 031.

[109] *See* JX 191 at p.4; JX 031.

### 3. Medley Capital's Special Committee Process

On June 19, 2018, the Medley Capital Board expanded the scope of the Special Committee's charter to consider the Proposed Transactions.[110] The Special Committee was empowered to evaluate and negotiate any proposed business combination, hire independent legal and financial advisors, determine whether the transaction was in the best interests of Medley Capital's stockholders, and recommend the approval or rejection of the transaction.[111]

#### a. What the Special Committee did.

The Special Committee retained a financial advisor. They interviewed two candidates. Ainsberg and Hirtler-Garvey participated in person; Mack and Lerdal participated by phone.[112] On June 21, 2018, at Brook Taube's recommendation, the committee members interviewed Medley Management's recent financial advisor,

---

[110] JX 164.

[111] *Id.* at pp.6–8.

[112] Trial Tr. at 170:9–171:3 (Ainsberg); *id*. at 299:19–300:1 (Hirtler-Garvey). *But see* Mack Dep. Tr. at 71:12–17 ("Q. And were you involved in the hiring of a financial advisor? A. I was not involved in the interview process. However, all of the members of the committee reviewed the submitted materials and voted on the hiring of the financial advisor.").

Credit Suisse.[113]  On June 22, 2018, the committee interviewed Sandler.[114]  The committee members met again on June 22 and 25, 2018, to select financial advisors, and they determined to retain Sandler.[115]  Ainsberg signed Sandler's engagement letter on June 29, 2018.[116]  Sandler gained access to the data room that day.[117]

The Special Committee next met on July 11, 2018, to consider the Proposed Transactions.[118]  Chris Donohoe of Sandler gave a presentation to give the committee "a solid grounding in understanding what Medley Capital looked like, what the other companies coming in would look like, and what a combined company

---

[113] Trial Tr. at 299:23–300:14 (B. Taube recommended Credit Suisse); JX 177 (June 21, 2018 Credit Suisse pitch book).

[114] JX 189 (Sandler engagement letter); JX 175 (June 22, 2018 Sandler pitch book); JX 187 (Email from B. Taube to J. Tonkel describing terms of Sandler engagement).

[115] JX 175; JX 430; Trial Tr. at 170–71 (Ainsberg).  Mack explained his reasons for selecting Sandler: "[T]hey gave a very good presentation and they were a lot cheaper than the other guy."  Mack Dep. Tr. at 72:2–4.  In Ainsberg's view: "[Sandler] had extensive experience in the BDC space.  They're a very highly regarded investment banker.  I had known the firm for many years reputationally.  I had never done any business with them.  They had known the folks at [Medley Management] but hadn't had any important retention . . . for a period of years."  Trial Tr. at 171:8–17.  And Ainsberg agreed that Sandler's "pricing for their assignment was significantly less than Credit Suisse, so finances were a factor." *Id.*

[116] PTO ¶ II.49; Medley Capital Proxy at 71.

[117] JX 703; Trial Tr. at 236:2–237:6 (Sterling).

[118] JX 209 at 2–4.

would look like . . . ."[119]  They authorized Sandler to negotiate on their behalf.[120]

The committee's goals in these negotiations was to obtain "greater value for [the Medley Capital] stockholders" and "make sure that the combined company was better positioned to succeed."[121]  To reach those goals, the committee (through Sandler) asked for cash consideration.[122]  In the alternative, they authorized Sandler to push for less cash to leave the combined company.[123]  Sandler negotiated on the founders' TRA and the management team's post-closing compensation.[124]  Finally, Sandler set out to "ensure that the disinterested shareholders of [Medley Capital] had representation and say in the management of the combined business" through board representation in the combined company.[125]

Sandler began to negotiate on July 11, 2018.[126]  Through negotiations, the founders agreed to waive the annual TRA payment,[127] Sierra agreed to permit two

---

[119] Trial Tr. at 240:2–241:8 (Sterling); JX 208; JX 209.

[120] Trial Tr. at 242:2–14 (Sterling).

[121] *Id*. at 243:17–18.

[122] *Id.* at 243:21–244:4.

[123] *Id.*

[124] *Id.* at 173–74 (Ainsberg); *id*. at 244:5–14 (Sterling).

[125] *Id.* at 244:15–19 (Sterling); *id.* at 395:9–16 (Hirtler-Garvey) ("That was an idea that they brought forward that we thought was a great idea.").

[126] JX 707.

[127] Trial Tr. at 246:12–247:6 (Sterling).

Medley Capital directors to join their Board,[128] and Sierra agreed to a higher exchange ratio than originally proposed.[129]  At Sandler's request, Sierra obtained a compensation expert's opinion concerning the management compensation packages.[130]  The opinion was provided on August 3, 2018,[131] with a supporting presentation.[132]  Sierra did not agree to any cash consideration for Medley Capital stockholders.[133]

On July 29, 2018, Medley Management, Medley Capital, and Sierra reached final agreement on the ratios.[134]  In the preceding three weeks, the Special Committee had met eight times.[135]

---

[128] JX 509 at p.5; JX 723 at 10; Trial Tr. at 244:15–19 (Sterling).

[129] Trial Tr. at 245:18–24, 246:5–8 (Sterling) (testifying that negotiations achieved a ratio that was equal to Medley Capital's "equity value or book value in the form of NAV").

[130] JX 288.

[131] The one-sentence letter reads: "It is our professional opinion that the employment agreements and the executive compensation packages attached to the merger agreement are reasonable."  JX 641.

[132] JX 299; Trial Tr. at 247:21–248:1.

[133] *Id*. at 246:1–4. *See generally id*. at 173–76 (Ainsberg).

[134] JX 280.

[135] *See* Dkt. 134, Defs.' Demonstrative SC-D-01 (Medley Capital Special Committee Meetings Between Retention of Sandler O'Neill and Announcement of Merger). *See also* JX 208 (July 11, 2018 Sandler presentation deck); JX 209 (July 11, 2018 board minutes); JX 223 (July 17, 2018 Sandler presentation deck); JX 225 (July 17, 2018 board minutes); JX 228 (July 18, 2018 Sandler presentation deck); JX 229 (July 18, 2018 board minutes); JX 235 (July 20, 2018 Sandler presentation deck); JX 236 (July 20, 2018 board minutes); JX 247 (July 20, 2018 Sandler presentation deck, draft); JX 248 (July 23, 2018 board

After settling on the economic terms, the parties focused on the legal terms of the merger agreement.[136] The Special Committee met four more times.[137] The record concerning negotiations of the deal protections is sparse. At least one document reflects that, as of August 8, 2018, the termination fee was still being negotiated.[138]

On August 9, 2018, Sandler presented its opinion to the Special Committee that the Medley Capital Merger Consideration was fair to Medley Capital stockholders from a financial point of view.[139] On August 9, 2018, the Special Committee approved Medley Capital's merger agreement with Sierra.[140]

### b. What the Special Committee did not do.

Out of the gate, the Special Committee failed to assert control over the timing of the process. At the June 2018 Medley Capital Board meeting, Medley

minutes); JX 257 (July 26, 2018 Sandler presentation deck); JX 259 (July 26, 2018 board minutes); JX 266; JX 278 (July 27, 2018 Sandler presentation deck); JX 268 (July 27, 2018 board minutes) JX 279 (July 28, 2018 board minutes).

[136] Trial Tr. at 177–78 (Ainsberg).

[137] JX 295 (Aug. 2, 2018 board minutes); JX 308 (Aug. 6, 2018 board minutes); JX 321 (Aug. 8, 2018 board minutes); JX 319 (Aug. 9, 2018 Sandler presentation deck, draft); JX 333 (Aug. 9, 2018 Sandler presentation deck); JX 335 (Aug. 9, 2018 board minutes); JX 640 (Sandler Summary of Synergies).

[138] JX 332 at p.6.

[139] PTO ¶ II.58; JX 333 (Sandler Fairness Opinion Presentation deck).

[140] *Id.* ¶ II.59.

Management presented an aggressive timeline, which contemplated that the parties would execute definitive transaction agreements and announce a transaction by July 31, 2018.[141] This made sense for Medley Management, which had shopped itself for more than a year prior to that point. By contrast, Medley Capital had not undertaken any strategic process before the June meeting.[142] Between its January 26, 2018 formation and the June 19, 2018 Board meeting, the Special Committee did not hold any meetings, retain a financial advisor, or engage in any substantive discussions with the Taube brothers or other members of Medley Management about a strategic transaction.[143] Unlike Medley Management, the Special Committee was starting from scratch. Unlike Medley Management, the Special Committee had no reason to rush deliberations. Yet, the committee capitulated to the timeline Medley Management proposed.

Then, throughout the negotiations, Brook Taube pressured the Special Committee to stick to the aggressive timeline. He denies this,[144] but

---

[141] *See* JX 163.

[142] *See* JX 702.

[143] *See* Medley Capital Proxy at 59–71. Despite the lack of any visible work, the Medley Capital Special Committee was paid a total of $280,000 between January and June 2018. JX 164 at p.6.

[144] Trial Tr. at 355:3–6 (Taube) ("Q. You were pushing the special committees of all of these entities to get a deal done; right? A. I was not.").

33

contemporaneous documents prove otherwise.[145] In a July 11, 2018, email to the Medley Management Board, Brook Taube emphasized that "[t]ime is not in our favor given performance, inquiries, letters, etc."[146] He specifically flagged the possibility of "unwanted interloping" and emphasized that it was "real and should be taken seriously by the board."[147] He went on to underscore the fact that the transaction represented a "100% premium and a great deal" for Medley Management.[148] On July 27, 2018, Brook instructed Medley Management and Goldman to advise Medley Capital that they "have a fiduciary obligation to close."[149] That same day, he emailed Broadhaven: "Make this happen!!!!!!"[150] On July 31, 2018, Brook Taube emailed Jeff Tonkel while Tonkel was on a "Sierra call with

---

[145] *Compare* Trial Tr. at 352 ("We wanted to have a process that was timely but sensible.") *with* JX 289 ("Thursday board meetings are the time to *push* these guys hard in person.") (emphasis added); JX 269 ("I want to agree on ONE suggestion (not a menu) and tell them they are better off . . . or at least no worse off . . . *and have a fiduciary obligation to close"*) (emphasis added); JX 275 ("Make this happen!!!!!! If not . . . I don't know what to say). *See also* Simpson Dep. Tr. at 623:23–225:2 ("Brook was pushing very hard – we advised the Special Committee that we had talked to Brook and that he was pushing very hard for his position.").

[146] JX 212 at p.3.

[147] JX 212 at p.3.

[148] *Id.* at p.4.

[149] JX 269.

[150] JX 275. Brookhaven's corporate representative, John Simpson, advised the Sierra special committee "that Brook was pushing very hard . . . that [Broadhaven] had talked to Brook and that he was pushing very hard for his position." Simpson Dep. Tr. at 224–25.

34

Tony."[151] He instructed Tonkel: "Thursday board meetings are the *time to push these guys hard* in person."[152] On August 1, 2018, Brook reported to the Medley Management Board that "[w]e and Goldman continue to believe the risk is substantial if we announce earnings without simultaneously announcing this deal."[153] On August 5, 2018, Lerdal texted Brook Taube: "Are we on track? Anything you need from me?" Taube responded: "Let's talk soon / *Pushing Hard* :-)"[154]

The Special Committee did not analyze the value of Medley Management, or understand what Medley Management would obtain in the Proposed Transactions, although in effect Medley Capital and Medley Management were competing for consideration. The Medley Management transaction and Medley Capital/Sierra Merger were cross-conditioned, and the new, combined company would own Medley Management post-closing.

---

[151] JX 289.

[152] *Id.* (emphasis added).

[153] JX 292.

[154] JX 717 at p.1 (emphasis added). Brook Taube did not produce text messages in discovery. Trial Tr. at 358. FrontFour was forced to press for them. Dkt. 127. Lerdal produced this text message after Brook Taube's deposition. Trial Tr. at 359:5–9.

The Special Committee did not consider alternative transactions,[155] although disgruntled stockholders were publicly advocating for a sale process as of April 2018. In a letter to the Board dated April 17, 2018, one Medley Capital stockholder wrote: "We believe the Board of Directors should immediately undertake a serious effort to sell the business (the underlying investment portfolio and the Management Agreement). We believe there is an attractive market for [Medley Capital's] investment portfolio well above where [Medley Capital's] current stock trades."[156] Although the Special Committee was broadly empowered, they laser-focused on only one option. Sandler corroborated—they viewed their role as evaluating the three-way combination only.[157]

The Special Committee did not conduct a pre-signing market check. When asked why, Hirtler-Garvey said she was happy with the transaction at hand.[158] She wanted a deal with Medley Management. Ainsberg testified to his belief that the 2017 Medley Management sales processes "effectively" checked the market for

---

[155] JX 569 ("Medley Capital did not contact any third parties for the purpose of exploring an Alternative Medley Capital Transaction between May 1, 2017 and execution of the Medley Capital Merger Agreement").

[156] JX 105. *See also* Trial Tr. at 20:8–13 (Lorber).

[157] Trial Tr. at 231:18–232:14 (Sterling).

[158] *Id.* at 419:17–420:4 (Hirtler-Garvey).

Medley Capital.[159] He believed that Party X's offer had the potential to result in a deal with Medley Capital.[160] Mack went further, testifying that he understood the Party X transaction to be geared toward a deal with Medley Capital, not with Medley Management.[161] This, of course, was wrong. Brook Taube testified, and contemporaneous evidence reflects, that the 2017 sales processes and negotiations with Party X aimed to develop strategic transactions and generate potential bidders *for Medley Management*, not Medley Capital.[162] Medley Capital was *not* "effectively" shopped.

---

[159] *Id*. at 182:2–183:4 (Ainsberg) ("We didn't shop the company because, if one steps back and thinks about the history of [Medley Management], starting in 2017, even before the Goldman Sachs and Brookhaven involvement, Medley Management undertook a process with both Credit Suisse and UBS to look at the marketplace to see if there would be an opportunity to come together with a group. And when [Medley Management] was doing that, as we discussed earlier, that involves [Medley Capital], because [Medley Capital] effectively would have to approve a transaction in some shape, manner, or form. So effectively what happened, both at the time of the Credit Suisse/UBS and at the time of the Goldman/Broadhaven reach-out to the street, many, many significant players in the street knew about it, that [Medley Management] was interested in the transaction. So this business effectively was -- was looked at. Now, did they look at our -- I don't know what they looked at, effectively, when they were looking at it, these other entities. I don't know what documents they were provided with. But you would assume that they, early on, before our current transaction, that these folks looked at various documents of the entities.").

[160] Trial Tr. at 225–28 (Ainsberg).

[161] Mack Dep. Tr. at 57:10–25. Mack also testified that he did not know or think about who Goldman Sachs was working for. *Id.* at 99:20–25. "They were – they were trying to shop to see whether there was a deal out there, but I'm not sure that I ever thought about who they were working for." *Id.* at 99:25–100:4.

[162] Trial Tr. at 289:21–293:24 (Taube); JX 022 (Benefit Street Partners non-binding proposal to Medley Management); JX 035 (Project Elevate Discussion Materials); JX 038

Although Medley Management's prior two sales processes informed the Special Committee's decision not to conduct a pre-signing market check, the committee members did *nothing* to inform themselves of basic aspects of those two sales processes. As discussed above, one member did not know that the process aimed to generate a deal for Medley Management, not Medley Capital.[163] No one asked about the terms of the potential Party X transaction or any other proposal received by Medley Management as part of those processes.

Critically, none of the committee members knew that approximately thirty confidentiality agreements contractually foreclosed potential third parties from proposing a transaction with Medley Capital. Of the thirty agreements, only two standstill periods expired before the Proposed Transactions were announced on August 9, 2018.[164] The other twenty-eight agreements restricted potential counterparties during the entire period that the Special Committee was negotiating the Proposed Transactions.[165]

(Project Elevate Preliminary Proposal Instructions); JX 031 (Broadhaven engagement letter).

[163] Mack Dep. Tr. at 57:3–25.

[164] *See* Dkt. 136, PDX 006 (Summary: Standstill Periods); *id.* PDX 007 (Summary: Standstill Periods, cont.).

[165] *See* Dkt. 136, Ex. A: PDX 006 (Summary: Standstill Periods).

When asked about the standstill agreements during his deposition, Mack stated his belief that "[t]his is a management issue, not a director [issue]."[166] He thought that more signed standstill agreements would be *beneficial* for Medley Capital.[167] He admitted, "I was not familiar with the specifics," and disclaimed any interest in being informed: "I may not want to know how sausage is made."[168]

The Special Committee did not probe meaningfully into the value of Medley Management. Medley Management's financial projections forecasted "hockey stick" growth in the outer years of the forecast based on revenue from new projects and clients.[169] Sandler ran a sensitivity analysis, but lacked much of the information that was concerned with whether the NII benefit from the deal was just projected growth, or whether there was underlying value and earnings to support the figures.[170]

Also, the Special Committee did not know about two expressions of interest from third parties concerning a transaction with Medley Capital. The first was from Origami, discussed above. The Special Committee did not learn of Origami's 2018

---

[166] JX628 at 52:7–10 ("You have to delegate things to the management. Directors direct. I'm sorry. Directors direct, managers manage.").

[167] Mack Dep. Tr. at 53:13–15 ("The fact is, as you -- as I think about it, the more the merrier. It's -- then it's just become a part of a process.").

[168] Mack Dep. Tr. at 53:13–22.

[169] JX 341 at p.28.

[170] Trial Tr. at 254:5–11 (Sterling).

39

outreach until Origami publicly disclosed it in February 2019.[171] The second was from Lantern, which executed a confidentiality agreement on May 23, 2018, as part of the Medley Management sales process.[172] On July 3, 2018, Tom Schmidt of Lantern reached out to Goldman about its interest in acquiring Medley Management and potentially recapitalizing Medley Capital.[173] Schmidt followed up on July 10.[174] He followed up again on July 20, this time expressing frustration.[175] On July 30, Lantern submitted an indication of interest.[176] Among other things, Lantern explained that it was "interested in exploring alternatives for providing a significant cash infusion of *new capital into Medley Capital* to the extent it is prudent."[177] Lantern's recapitalization idea did not reach the Special Committee before execution of the Merger Agreement.

---

[171] *Id.* at 213:10–23 (Ainsberg).

[172] JX 137.

[173] JX 197.

[174] JX 213.

[175] JX 234 ("I have not been able to get you guys to respond since Tuesday. Left messages at the office for you as well as email. Not trying to be difficult but would like some input on scheduling. If I need to get to NYC I will do that. Thank you.").

[176] JX 286.

[177] JX 283 at p.2 (emphasis added).

## C. The Proposed Transactions

On August 9, 2018 the Special Committee unanimously recommended that the Board approve the merger agreement with Sierra (the "Merger Agreement").[178] Medley Management, Medley Capital, and Sierra announced the Proposed Transactions on August 9, 2019.[179]

The Merger Agreement contains a series of deal protection provisions. Section 7.10 of the Merger Agreement prevents Medley Capital from soliciting or engaging with parties submitting "Competing Proposals" unless it constitutes a "Superior Proposal" or is likely to lead to one.[180] "Competing Proposal" is defined

---

[178] PTO ¶ II.59; JX 336.

[179] JX 350.

[180] JX 317 (Merger Agr.) § 7.10(d) ("Notwithstanding anything to the contrary contained in this Agreement, at any time prior to the date that [Medley Capital] Stockholder Approval is obtained (in the case of [Medley Capital]) or [Sierra] Stockholder Approval is obtained (in the case of [Sierra]), in the event that [Medley Capital] (or its representatives on [Medley Capital's] behalf) or [Sierra] (or its representatives on [Sierra's] behalf) receives a Competing Proposal from any Third Party, (i) [Medley Capital] and its representatives or [Sierra] and its representatives, as applicable, may contact such Third Party to clarify any ambiguous terms and conditions thereof (without the [Medley Capital] Board or [Sierra] Board, as applicable, being required to make the determination in clause (ii) of this Section 7.IO(d)) and (ii) [Medley Capital] and the [Medley Capital] Board and its representatives or [Sierra] and the [Sierra] Board and its representatives, as applicable, may engage in negotiations or substantive discussions with, or furnish any information and other access to, any Third Party making such Competing Proposal and its representatives and Affiliates if the [Medley Capital] Board or [Sierra] Board, as applicable, determines in good faith (after consultation with its outside financial advisors and legal counsel) that (A) such Competing Proposal either constitutes a Superior Proposal or could reasonably be expected to lead to a Superior Proposal and (B) failure to consider such Competing Proposal could

41

as an offer to acquire 20% or more of Medley Capital's securities or assets or a liquidation.[181] "Superior Proposal" is defined as a Competing Proposal that is on terms more favorable, from a financial point of view, than the Merger Agreement

reasonably be expected to be inconsistent with the fiduciary duties of the directors of [Medley Capital] or [Sierra], as applicable, under Applicable Law; provided, that (x) such Competing Proposal did not result from any material breach of any of the provisions set forth in this Section 7.10, (y) prior to furnishing any material non-public information concerning [Medley Capital] or [Sierra], as applicable, [Medley Capital] or [Sierra], as applicable, receives from such Third Party, to the extent such Third Party is not already subject to a confidentiality agreement with [Medley Capital] or [Sierra], as applicable, a confidentiality agreement containing confidentiality terms that are not less favorable in the aggregate to [Medley Capital] or [Sierra], as the case may be, than those contained in the Confidentiality Agreement (unless [Medley Capital] or [Sierra], as applicable, offers to amend the Confidentiality Agreement to reflect such more favorable terms) (it being understood and agreed that such confidentiality agreement need not restrict the making of Competing Proposals (and related communications) to [Medley Capital] or the [Medley Capital] Board or to [Sierra] or the [Sierra] Board, as the case may be) (an *'Acceptable Confidentiality Agreement'*) and (z) [Medley Capital] or [Sierra], as the case may be, shall (subject to the terms of any confidentiality agreement existing prior to the date hereof) promptly provide or make available to the other party any material written non-public information concerning it that it provides to any Third Party given such access that was not previously made available to the other party or its representatives.") (emphasis original).

[181] *Id.* § 1.1 ("*'Competing Proposal'* means any inquiry, proposal or offer made by any Third Party: (a) to purchase or otherwise acquire, directly or indirectly, in one transaction or a series of transactions (including any merger, consolidation, tender offer, exchange offer, stock acquisition, asset acquisition, binding share exchange, business combination, recapitalization, liquidation, dissolution, joint venture or similar transaction), (i) beneficial ownership (as defined under Section 13(d) of the Exchange Act) of twenty percent (20%) or more of any class of equity securities of [Medley Capital] or [Sierra], as applicable, or (ii) any one or more assets or businesses of [Medley Capital] or its Subsidiaries or [Sierra] or its Subsidiaries that constitute twenty percent (20%) or more of the revenues or assets of [Medley Capital] and its Subsidiaries, taken as a whole, or [Sierra] and its Subsidiaries, taken as a whole, as applicable; or (b) any liquidation of [Medley Capital] or [Sierra], in each case other than the Merger and the other transactions to occur at Closing in accordance with this Agreement.") (emphasis original).

and is as likely to close.[182]  Section 7.10(e) of the Merger Agreement provides that

the Medley Capital Board may not make an "Adverse Recommendation Change" or

enter into any agreement (other than a confidentiality agreement), subject to a

fiduciary out.[183]  Section 9.4 of the Medley Capital Merger Agreement provides for

---

[182] *Id.* ("***'Superior Proposal'*** means any bona fide written Competing Proposal made by a Third Party that the [Medley Capital] Board or the [Sierra] Board, as applicable, determines in good faith, after consultation with its outside financial advisors and legal counsel, and taking into account the terms and conditions of such proposal, the party making such proposal, all financial, legal, regulatory and other aspects of such proposal, as well as the likelihood of consummation of the Competing Proposal relative to the Merger and such other factors as the [Medley Capital] Board or [Sierra] Board, as applicable, considers to be appropriate, is more favorable to [Medley Capital's] stockholders or [Sierra's] stockholders, as applicable, from a financial point of view than the Merger and the other transactions contemplated by this Agreement (including any revisions to the terms of this Agreement committed to by [Sierra] to [Medley Capital] in writing in response to such Competing Proposal made to [Medley Capital] or by [Medley Capital] to [Sierra] in writing in response to such Competing Proposal made to [Sierra] under the provisions of Section 7.10(f); provided however, for these purposes, to the extent relevant to the Competing Proposal in question, all percentages in subsections (a)(i) and (a)(ii) of the definition of Competing Proposal shall be increased to fifty percent (50%).") (emphasis original).

[183] *Id.* § 7.10(e) ("Except as otherwise provided in this Agreement, (i) the [Medley Capital] Board shall not effect [a Medley Capital] Adverse Recommendation Change and the [Sierra] Board shall not effect [a Sierra] Adverse Recommendation Change (each, an ***'Adverse Recommendation Change'***), (ii) [Medley Capital] Board shall not approve or recommend, or allow [Medley Capital] to execute or enter into, any letter of intent, memorandum of understanding or definitive merger or similar agreement with respect to any Competing Proposal (other than an Acceptable Confidentiality Agreement), and (iii) the [Sierra] Board shall not approve or recommend, or allow [Sierra] to execute or enter into, any letter of intent, memorandum of understanding or definitive merger or similar agreement with respect to any Competing Proposal (other than an Acceptable Confidentiality Agreement); provided however, that notwithstanding anything in this Agreement to the contrary, if at any time prior to the receipt of [Medley Capital] Stockholder Approval (in the case of [Medley Capital]) or the [Sierra] Stockholder Approval (in the case of [Sierra]), [Medley Capital] or [Sierra], as the case may be, has

a $6 million "Termination Fee," which Medley Capital must pay if either party terminates the Medley Capital Merger Agreement after the Medley Capital Board effects an "Adverse Recommendation Change," or if Medley Capital terminates the Medley Capital Merger Agreement to enter into a definitive agreement contemplated by a Superior Proposal.

---

received a Competing Proposal that its board of directors has determined in good faith (after consultation with its outside financial advisor and legal counsel) constitutes a Superior Proposal, the [Medley Capital] Board or [Sierra] Board, as applicable, may (x) make an Adverse Recommendation Change in connection with such Superior Proposal if the board of directors effecting the Adverse Recommendation Change determines in good faith (after consultation with its outside financial advisor and legal counsel) that failure to make an Adverse Recommendation Change could reasonably be expected to be inconsistent with the fiduciary duties of the [Medley Capital] Board or [Sierra] Board, as applicable, under Applicable Law, and/or (y) authorize, adopt or approve such Superior Proposal and cause or permit [Medley Capital] or [Sierra], as applicable, to enter into a definitive agreement with respect to such Superior Proposal concurrently with the termination of this Agreement in accordance with Section 9.1(g) or 9.1(i), as applicable, but in each case only after providing the Notice of Adverse Recommendation or Notice of Superior Proposal, as applicable, and entering into good faith negotiations as required by Section 7.lO(f).") (emphasis original).

Employment contracts connected to the merger provide for lucrative positions for Medley Management's senior management.[184] The cost of these employment contracts exceeds the estimated synergies arising from the Proposed Transactions.[185]

## D. Post-Signing Events

### 1. FrontFour's Reaction

FrontFour beneficially owns 1,674,946 shares of Medley Capital common stock, which constitutes approximately 3.1% of Medley Capital's outstanding shares.[186] FrontFour first learned of the Proposed Transactions when they were publicly announced on August 9, 2018.[187]

---

[184] Trial Tr. at 405:13–20 (Hirtler-Garvey). Brook Taube will be Chairman and CEO of the combined company and will receive an employment package that includes a base $600,000 annual salary and a $3.2 million incentive bonus comprising $2 million in restricted stock units and $1.2 million in cash. PTO ¶ II.69. Seth Taube will be Vice Chairman, Senior Executive Vice President and Senior Managing Director of the combined company and will receive an employment package, with a base $480,000 annual salary and a $1.75 million incentive bonus comprising $1.15 million in restricted stock units and $600,000 in cash. PTO ¶ II.70. Tonkel will serve as President of the combined company and will receive an employment package, with a base $480,000 annual salary and a $1.75 million incentive bonus comprising $1.15 million in restricted stock units and $600,000 in cash. PTO ¶ II.71.

[185] Trial Tr. at 405:16–406:3 (Hirtler-Garvey).

[186] Dkt. 128, Pretrial Order ("PTO") ¶ II.1; JX466; JX 720. FrontFour is on the "smaller scale of hedge funds. Assets under management are . . . about $150 million." Trial Tr. at 11, 55 (Lorber).

[187] *Id.* at 16.

45

FrontFour's corporate representative, David Lorber, testified at trial that he was "perplexed" by the announcement.[188]  He believed that Medley Management had performed poorly over the prior five years, "erod[ing] significant NAV value, as well as stock price," yet "Medley Management was receiving an excessive amount of value" in the Merger Transactions.[189]

A FrontFour analyst reached out to Medley Capital to "better understand the transaction"[190] and eventually was placed in contact with Medley Capital's risk management officer, Sam Anderson.[191]  They spoke on the phone in late September.[192]  FrontFour was not aware during that call that Anderson was also a senior managing director of Medley Management.[193]  During the call, FrontFour's representative asked why the proxy had not yet been issued.[194]  Anderson responded suggesting that the parties to the Merger Transactions were having difficulty

---

[188] *Id.*

[189] *Id.* at 16:11–18:6.

[190] *Id.* at 18:19–24.

[191] *Id.* at 24:19–24.

[192] *Id.* at 24:22–23.

[193] *Id.* at 24:6–18.

[194] *Id.* at 25:10–16.

agreeing on the disclosures, which raised concerns for FrontFour.[195] After the call, FrontFour asked to be placed in contact with Medley Capital's independent directors.[196] Instead, Brook Taube responded. He promised to "revert back."[197] He did not timely do so.[198]

On November 2, 2019, FrontFour nominated Lorber and Clifford Press as candidates for election as directors at Medley Capital's next annual meeting of stockholders.[199] On November 20, 2018, FrontFour obtained a telephonic meeting with Ainsberg and Hirtler-Garvey.[200] John Fredericks, Medley Capital's Chief Compliance Officer—who is also Medley Management's General Counsel and Sierra's Chief Compliance Officer—joined the call and did all of the talking.[201] On

---

[195] As Lorber described: "[Anderson] said to Steve [FrontFour's representative], 'have you ever done a merger before?' Steve said, 'you know, yes, I have.' And Sam said, 'have you ever done a three-way merger?' Steve said, 'no, actually I haven't.' And then Sam said, 'well, it's very difficult to get three parties to agree on what actually happened.' That was quite alarming. Given that what actually [happened] should be factual. It shouldn't be difficult to get people to agree on what actually happened." *Id.* at 25:10–24.

[196] *Id.* at 26.

[197] *Id.*

[198] *Id.* at 27:16–20.

[199] JX 396. Lorber testified that this was the deadline for nomination letters. Trial Tr. at 29. Medley Capital has not noticed the 2019 annual meeting. *Id.* at 31.

[200] JX 409; Trial Tr. at 27–28. The meeting was held telephonically, as Medley Capital refused FrontFour's request for an in-person meeting. *Id.* at 28.

[201] *Id.* at 28.

47

November 27, 2018, Medley Capital responded to questions raised by Lorber on the call.[202] On December 13, 2018, FrontFour issued an open letter to stockholders opposing the Proposed Transactions.[203]

### 2. Medley Capital's Public Disclosures

During an investors call on August 10, 2019, Medley Capital management represented that the proxy statement would be filed within weeks.[204] Medley Capital issued the proxy statement on December 21, 2019.[205] It was flawed.[206] On January 11, 2019, FrontFour commenced litigation in this Court pursuant to 8 *Del. C.* § 220 to compel Medley Capital to produce book and records for inspection.[207] After an initial scheduling conference with the Court, Medley Capital voluntarily

---

[202] JX 409.

[203] JX 421.

[204] JX 365 (Transcript of Aug. 10, 2018 Medley Investor Conference Call re: Merger Overview) at p.2 ("there will be further detail in our proxy which will file in the next few weeks"); Trial Tr. at 25:10–14 (Lorber).

[205] *See* Medley Capital Proxy.

[206] It claimed that, "because each of the proposals submitted included various conditions and carve-outs, and different forms of consideration, some of which was contingent, and in light of the fact that none were binding, it would be both *impracticable* and *speculative* to assign a particular value to any such proposal." *Id.* at 57 (emphasis added); *see also id.* at 59. But it was possible to derive enterprise, equity and corresponding per-share values for Medley Management (as well as implied premium calculations) from each of the IOIs; Medley Management and its advisors did exactly that when communicating internally. JX 705.

[207] C.A. No. 2019-0021-KSJM.

48

produced to FrontFour stocklist materials and certain core documents concerning the Merger.[208] On January 30, 2019, FrontFour raised questions regarding the adequacy of the disclosures in the Proxy.[209] On February 5, 2019, Medley Capital issued the Proxy Supplement and postponed the stockholder vote until March 8, 2019.[210]

### 3. Multiple Third Parties Express Interest in Medley Capital

After Medley Capital issued the proxy, multiple third parties expressed interest in entering into an alternative transaction with Medley Capital.

- *ZAIS.* On January 2, 2019, ZAIS submitted a letter proposing that the Special Committee appoint ZAIS as the new investment advisor for the sole purpose of managing an orderly sale or liquidation of Medley Capital.[211] ZAIS requested the opportunity to meet the Special Committee to share its views. The Special Committee met to consider the proposal on January 9, 2019.[212] Nobody acting on behalf of the Special Committee ever contacted ZAIS. On January 24, 2019, Brook Taube instructed ZAIS that the Medley Capital Merger Agreement prohibited contact.[213]

- *NexPoint.* On January 24, 2019, NexPoint Advisors, L.P. ("NexPoint") submitted a letter of intent proposing that Medley Capital terminate the Management Agreement and replace Advisors with NexPoint, which would charge a lower fee and make a cash payment to Medley

---

[208] *Id.* at Dkt. 17 (Oral Argument on Pls.' Mot. to Expedite and the Court's Ruling).

[209] JX 706.

[210] JX 513.

[211] JX 432.

[212] JX 439.

[213] JX 459; Trial Tr. at 366:22–367:10 (Taube).

Capital.[214] On January 31, 2019, NexPoint made a second proposal contemplating the combination of Medley Capital and Sierra and the retention of $100 million in cash otherwise earmarked for Medley Management stockholders in the Proposed Transactions.[215] NexPoint also proposed to pay $25 million to the combined company for the benefit of stockholders, to provide a reduced fee structure and lowered costs (resulting in at least $9 million in annual savings), and to purchase at least $50 million of combined company shares over a five-quarter period.[216]

On February 1, 2019, NexPoint made both its proposals public.[217] On February 6, 2019, Medley Capital and Sierra issued a press release indicating that their respective special committees had unanimously determined not to pursue the second NexPoint Proposal.[218] The press release purported to identify the reasoning behind the determinations by the Special Committees. But Medley Management had drafted the press release before the Special Committee had even made its determination.[219]

- *Origami.* On February 11, 2019, Origami issued an open letter to the Medley Capital Board, proposing to buy 100% of the interests of Medley Capital's wholly owned subsidiary, Medley SBIC, for $45 million cash.[220] Origami also disclosed that it had reached out several times during the spring of 2018 and sent a formal letter on April 4, 2018

---

[214] JX 458.

[215] JX 472.

[216] *Id.*

[217] JX 488. After NexPoint made its proposals public, ISS changed its recommendation to voting against the Proposed Transactions. ISS initially recommended voting in favor of the merger based on the theory that it was the better of two bad options. JX 463 at p.2 (describing the Proposed Transactions as "the better of the two underwhelming options available to shareholders").

[218] JX 524.

[219] JX 514.

[220] JX 544.

expressing interest but had never received a response.[221]   On February 14, 2019, Origami sent another letter clarifying and reiterating its interest in a potential transaction.[222]  On February 19, 2019, Medley Capital rejected Origami's proposal.[223]

- *Marathon.*  On March 1, 2019, Marathon Asset Management L.P. ("Marathon") submitted a letter to the Special Committee proposing that Medley Capital remain as an independent company, terminate the Management Agreement, and enter into a new management contract with Marathon.[224]

The Special Committee held meetings to consider the multiple expressions of interest.  But nobody reached out to ZAIS, except to confirm that the Merger Agreement prohibited contact.[225]  Nor has anyone acting on behalf of the Special Committee contacted NexPoint or Origami, despite their expressed willingness to improve their proposals.[226]  The Special Committee has never asked for a waiver of the non-solicitation provisions of the Merger Agreement to enable discussions with

---

[221] *See id*; *see also* JX 101.

[222] JX 557.

[223] JX 564.

[224] Medley Capital Corp., Non-Management Solicitation Material (Form DFAN14A) (Mar. 6, 2019).

[225] JX 459; Trial Tr. at 366:22–367:10 (Taube).

[226] Trial Tr. at 188:21–189:1 (Ainsberg); *id.* at 424:2–425:3 (Hirtler-Garvey).

any of these potential counterparties, nor has it attempted to secure better terms from the Taube brothers.[227]

In sum, the Special Committee considered each offer, but did not engage with any competing bidder, and seems to question the need to do so.[228] Their attitude is best captured by Lerdal in a text to Brook Taube. Around the time of the Special Committee meeting at which the ZAIS offer was considered, Lerdal texted Brook Taube: "Are we going to respond to every f\*\*ksake on the planet?"[229]

### E. The Litigation

FrontFour commenced this litigation on February 11, 2019, and amended the complaint the next day to reflect the Origami offer.[230] Defendants stipulated to an

---

[227] Also, as discussed above, in May 2018, Lantern expressed an interest in a possible transaction that involved a recapitalization of Medley Capital. JX 138. On July 3, 2018, a Lantern representative again reached out to Goldman: "[A]ny chance we can talk today? I have been speaking with Todd Owens [of Broadhaven] about our interest in acquiring [Medley Management] and recapitalizing Medley Capital. Thanks!" JX 197. By that time, Project Integrate was underway. The Special Committee was unaware of this offer when they were negotiating the Proposed Transactions, and it has never been disclosed to Medley Capital stockholders. Despite a call that apparently took place between Lantern and "the company" in late July 2018, followed by an email to Russ Hutchinson, no one from Medley Capital pursued Lantern's proposal. JX 254; Trial Tr. at 188:21–189:1 (Ainsberg) ("Q. And what happened with respect to the proposals, at least at the – what's happened so far with respect to the proposals? That is to say, Zais, NexPoint, and Origami. A. They've all been rejected.").

[228] Trial Tr. at 222:16–225:7 (Ainsberg); *id.* at 423:5–425:3 (Hirtler-Garvey).

[229] JX 717 at p.11.

[230] Dkt. 1; Dkt. 8 ("Am. Compl.").

52

expedited schedule, and the parties agreed to hold trial before the March 8, 2019 stockholder vote.[231] The parties substantially completed document production by February 24, 2019, took twelve depositions between February 26 and March 4, 2019, and submitted pretrial briefs and a form of pretrial order on March 4, 2019.[232] A pretrial conference was held on March 5, 2019.[233] Trial took place on March 6 and 7, 2019.[234]

## II.   ANALYSIS

The Amended Complaint asserts three counts: Count I contends that the Taube brothers, Tonkel, and the Special Committee members breached their fiduciary duties to FrontFour and the members of the Class in connection with the approval of the Proposed Transactions.[235] Count I challenges the Proposed Transactions under the entire fairness standard (the "Entire Fairness Claim"), and the deal protections of the Merger Agreement under enhanced scrutiny (the "Enhanced Scrutiny Claim"). Count II contends that the Medley Capital directors breached their fiduciary duty of

---

[231] Dkt. 63; Dkt. 79.

[232] Dkt. 271, 81, 116, 117, 118, 124.

[233] Dkt. 128, PTO ¶ II.130.

[234] Dkt. 133.

[235] Am. Compl. ¶¶ 144–52.

disclosure (the "Disclosure Claims").[236]  Lastly, Count III contends that Medley Management, Sierra, Advisors, and two other Medley Entities—Medley Group and Medley LLC—aided and abetted in the other Defendants' breaches of fiduciary duties.[237]

### A.     Entire Fairness Claim

"Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[238]  Entire fairness review arises "when the board labors under actual conflicts of interest,"[239] such as when a controlling stockholder stands on both sides of a challenged transaction[240] or when a controlling stockholder competes with the minority stockholders for consideration.[241]

---

[236] *Id.* ¶¶ 153–60.

[237] *Id.* ¶¶ 161–67.

[238] *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011).

[239] *Id.*

[240] *Kahn v. Tremont Corp.* (*Tremont II*), 694 A.2d 422, 428 (Del. 1997); *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983).

[241] *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009), *interlocutory appeal refused*, 984 A.2d 124 (Del. 2009) (TABLE); *see In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232, at *12 n.57 (Del. Ch. Mar. 6, 2012) (applying entire fairness where the controlling stockholder received differential merger consideration); *see also In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 487 (Del. Ch.

FrontFour argues that the Proposed Transactions should be reviewed under Delaware's most onerous standard,[242] entire fairness. The Taube brothers stand on both sides of the Proposed Transactions, so entire fairness applies if they are deemed controllers. FrontFour bears the burden of proving by a preponderance of the evidence facts necessary to trigger entire fairness. If entire fairness is triggered, Defendants bear the burden of proving by a preponderance of the evidence that the Proposed Transactions are entirely fair.

### 1. Entire Fairness Applies Because the Taube Brothers Are Controllers.

The Taube brothers beneficially own less than 15% of Medley Capital, and those shares are subject to "echo voting" requirements. Although a majority stockholder is a controlling stockholder as a matter of law,[243] a minority stockholder

---

2013) (applying entire fairness where "the [m]erger conferred a unique benefit on" the controlling stockholder).

[242] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013).

[243] *Lynch*, 638 A.2d at 1113 (observing that a stockholder becomes a fiduciary if it "owns a majority interest in . . . the corporation" (internal quotation marks omitted)); *see In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006) (Strine, V.C.) ("Under our law, a controlling stockholder exists when a stockholder . . . owns more than 50% of the voting power of a corporation . . . ."); *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) ("A shareholder is a 'controlling' one if she owns more than 50% of the voting power in a corporation.").

can also be deemed a controller.[244]  In determining whether a minority stockholder

is a controller, the level of stock ownership is not the predominant factor, and an

---

[244] *See Lynch*, 638 A.2d at 1113 (observing that a stockholder becomes a fiduciary if it "*exercises control* over the business affairs of the corporation" (emphasis original)); *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *19 (Del. Ch. Mar. 28, 2018) (concluding on a motion to dismiss that it was reasonably conceivable that Musk, owner of 22.1% of company's common stock, was a controller based on well-pled facts related to "Musk's voting influence, his domination of the Board during the process leading up to the [challenged acquisition] against the backdrop of his extraordinary influence with the Company generally, the Board level conflicts that diminished the Board's resistance to Musk's influence, and the Company's and Musk's own acknowledgement of his outsized influence"); *Calesa Assocs. v. Am. Capital, Ltd.*, 2016 WL 770251, at *10–12 (Del. Ch. Feb. 29, 2016) (concluding on motion to dismiss that it was reasonably conceivable that stockholder owning 26% of the company's stock exercised actual control where the plaintiff alleged instances of actual control beyond the fact that the stockholder "exercised duly obtained *contractual* rights to its benefit and to the detriment of the company"); *In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457, at *7–8 (Del. Ch. Nov. 26, 2014) (concluding on motion to dismiss that it was reasonably conceivable that stockholder owning only 17.3% of the company's stock was a controller because the stockholder was CEO and the company's 10-K stated that the stockholder effectively controlled the company), *rev'd on other grounds sub nom. In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173 (Del. 2015); *Williamson*, 2006 WL 1586375, at *4–5 (concluding on a motion to dismiss that it was reasonably conceivable that two stockholders, owning collectively 17.1% of the company's stock, jointly controlled the company based on their ability to nominate two of the five directors, their ability to influence the flow of revenue into the corporation, and their potential "veto" power over certain corporate decisions); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 535, 551–52 (Del. Ch. 2003) (Strine, V.C.) (finding post-trial that a stockholder owning 35% of the company's stock controlled the company because he was a "hands-on" "Chairman and CEO of [the company]," and because he had the ability to "elect a new slate [of independent directors] more to his liking without having to attract much, if any, support from public stockholders" through his familial ties with the company's other stockholders); *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 912–13, 915–16 (Del. Ch. 1999) (concluding on motion to dismiss that it was reasonably conceivable that a 49% stockholder exercised actual control where the plaintiff alleged that the stockholder forced the board to comply with its terms on the merger through threats).

inability to exert influence through voting power does not foreclose a finding of control.[245]

Under Delaware law, a plaintiff can demonstrate that a minority stockholder exercised *de facto* control by showing that: (a) the stockholder "actually dominated and controlled the majority of the board generally";[246] or (b) the stockholder "actually dominated and controlled the corporation, its board or the deciding committee with respect to the challenged transaction."[247]

---

[245] *See Tesla*, 2018 WL 1560293, at \*14 ("[T]here is no absolute percentage of voting power that is required in order for there to be a finding that a controlling stockholder exists." (quoting *PNB Hldg.*, 2006 WL 2403999, at \*9)); *Calesa Assocs.*, 2016 WL 770251, at \*11 (explaining that there is "no correlation between the percentage of equity owned and the determination of control status"); *see In re Crimson Expl. Inc. S'holders Litig.*, 2014 WL 5449519, at \*10–12 (Del. Ch. Oct. 24, 2014) (collecting cases discussing when a stockholder may be considered a controlling stockholder).

[246] *Tesla*, 2018 WL 1560293, at \*13; *In re Rouse Props., Inc.*, 2018 WL 1226015, at \*12 (Del. Ch. Mar. 9, 2018) (citing *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2325152, at \*17 (Del. Ch. May 31, 2017); *Cysive*, 836 A.2d at 531, and *Lynch*, 638 A.2d at 1114–15); *see In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 257 (Del. Ch. 2006) ("[T]he plaintiffs need not demonstrate that [the alleged controller] oversaw the day-to-day operations of Primedia. Allegations of control over the particular transaction at issue are enough.").

[247] *Rouse*, 2018 WL 1226015, at \*12 (citing *Williamson*, 2006 WL 1586375, at \*4); *Tesla*, 2018 WL 1560293, at \*13; *see also Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at \*27 (Del. Ch. July 6, 2018) ("Broader indicia of effective control also play a role in evaluating whether a defendant exercised actual control over a decision. Examples of broader indicia include ownership of a significant equity stake (albeit less than a majority), the right to designate directors (albeit less than a majority), decisional rules in governing documents that enhance the power of minority stockholder or board-level position, and the ability to exercise outsized influence in the

FrontFour has proven facts necessary to trigger entire fairness under the second theory. Specifically, FrontFour has proven that at least half of the Special Committee members were not independent from the Taube brothers when negotiating the Proposed Transactions. Under Delaware law, calling a director "independent" does not make it so. To be independent, a director "must *act* independently."[248] An independent director should demonstrate "the care, attention and sense of individual responsibility to the performance of one's duties . . . that generally touches on independence."[249]

Mack, who did not testify at trial, demonstrated a lack of independence through his deposition testimony, where:

- Mack spoke to Brook Taube on the phone frequently, at least weekly, about business matters.[250]

---

board room, such as through high-status roles like CEO, Chairman, or founder." (footnotes omitted)).

[248] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002) (emphasis added); *see also Tesla*, 2018 WL 1560293, at *17 ("Even an independent, disinterested director can be dominated in his decision-making by a controlling stockholder.").

[249] *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984) *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *accord Tremont II*, 694 A.2d at 430; *Telxon*, 802 A.2d at 264.

[250] Mack Dep. Tr. at 16–17.

- Mack knew that the Taube brothers managed Medley Capital's investments, but couldn't identify any other person involved in managing Medley Capital's portfolio.[251]

- Mack had no idea what Medley LLC was, who owned it, or the role it played in the Taube brothers' control of the Medley family of entities.[252]

- Mack had no understanding of what Medley Management's business was in 2017.[253]

- Mack could not identify the Taube brothers' or Tonkel's roles at Medley Management, the very source of their conflicts.[254]

- Mack did not know that the Taube brothers controlled Medley Management, and did not think it was important to consider their ownership of Medley Management in evaluating the Proposed Transactions.[255]

- Mack "was not familiar with the specifics" of the transaction process and "may not want to know how sausage is made."[256]

- Based on a call with Brook Taube, Mack believed Goldman Sachs was engaged to assist Medley Capital.[257]

---

[251] *Id.* at 23–24.

[252] *Id.* at 30–31.

[253] *Id.* at 44.

[254] *Id.*

[255] *Id.* at 31.

[256] *Id.* at 53.

[257] *Id.* at 46–47.

- Mack did not believe the standstill provisions should have been reviewed by the Board, calling it a "management issue, not a director [issue]" and suggesting "the more the merrier."[258]

- Mack did not think it was important for the Medley Capital Board to be informed when Medley Management entered contracts that were binding on Medley Capital.[259]

- Mack had no idea whether Medley Capital paid performance fees to Advisors in 2017, or how the fees Advisors collected from Medley Capital affected Advisors' ability to pay its employees.[260]

- Mack believed that the Party X proposal was geared toward a deal with Medley Capital, not Medley Management.[261]

- Mack could not recall whether he considered having Sandler perform any form of a market check.[262] Instead, he relied on Brook Taube for his purported knowledge that "we were looking at strategic alternatives."[263]

- Mack did not believe that Medley Capital had ever solicited the market on its own behalf and was indifferent about the failure to do so.[264]

---

[258] *Id.* at 52–53.

[259] *Id.* at 52–53.

[260] *Id.* at 63.

[261] *Id.* at 57. Until his deposition, Mack "never really thought about the entities" involved in the proposal. *Id*. at 118; *see id.* ("I thought it was Medley Capital, but I would say that's just me not digging into who the parties are.").

[262] *Id*. at 73.

[263] *Id.* at 53.

[264] *Id.* at 72–73.

- Mack did not think the personal interests of the Taube brothers in closing the Proposed Transactions were relevant considerations in evaluating the transactions.[265]

- Mack did not have any understanding as to the significance of the Taube brothers' Medley Capital stockholdings or how they came to hold that position.[266]

- Mack was completely unaware as to the financing arrangement that the Taube brothers had with Fortress, which intensified the "enormous pressure" that drove the Taube brothers' decision to pursue the Proposed Transactions.[267]

- Mack did not think the fund's recent performance was an important consideration in the annual review of Advisors' contract with Medley Capital. Mack stressed the Board would consider comparisons to the fees and legal restrictions of comparable advisory arrangements, but did not think that recent performance was particularly important.[268]

- The lack of cash consideration for Medley Capital stockholders in the Proposed Transactions raised no concerns for Mack, even in the face of the large cash component that Medley Management was going to receive in the transactions.[269]

- Mack was indifferent to the compensation levels that would be paid to senior management in the combined company, even in the face of conversations concerning the fact that the compensation packages could potentially eliminate the benefits touted for Medley Capital stockholders in the Proposed Transactions.[270] Mack was satisfied that

---

[265] *Id.* at 32.

[266] *Id.* at 33–34.

[267] *Id.* at 34–35.

[268] *Id.* at 42–43.

[269] *Id.* at 79.

[270] *Id.* at 82–83.

it was a concern for Sierra's board because they were negotiating and deciding the compensation, rather than the Medley Capital Board.[271]

The record also reflects that half of Mack's annual income in the past three years had come from his service on the Board, making him susceptible to wanting to stay in the good graces of the Taube brothers.[272]

Lerdal was similarly susceptible to Brook Taube's outsized influence as Medley Capital's founder.[273] Lerdal desired to continue as director after formation of the combined company. He curried favor from Brook Taube during the selection process. When he was not selected, he contacted Brook Taube for other personal favors. The record reflects that Lerdal, who did not testify at trial, was loyal to Brook Taube, not the Medley Capital common stockholders:

- Lerdal shared information about the Special Committee's process with Brook.[274]

---

[271] *Id.* at 80–81, 83.

[272] *Id*. at 10–11.

[273] *See Basho Techs.*, 2018 WL 3326693, at \*27 (explaining that a broader indicia of effective control includes "the ability to exercise outsized influence in the board room, such as through high-status roles like CEO, Chairman, or founder").

[274] JX 717 at p.11 (text message chain on January 9, 2019 at 2:56 p.m.: Lerdal: "Old ladies and their schedules . . ."; Brook: "Whoa"; Lerdal: "Recommendation will be forthcoming. Proper response. Your question was the proper one."; Brook: "Which one?"; Lerdal: "Are we going to respond to every f\*\*ksake on the planet?")

- Lerdal personally kept Brook up to date on market interest in Medley Capital, warning him by text on August 15, 2018 that the company "has some bargain hunters."[275]

- Four days before approving the merger, Lerdal asked Brook: "Are we on track? Anything you need from me?"[276] The two talked on the phone soon thereafter.

- The day the Special Committee approved the Proposed Transactions, Lerdal praised Brook as the "architect" of the deal and stated that he was "excited for the future whether the Sierra guys give me the nod or not."[277]

- When the Special Committee decided to turn down a bidder in February 2019, Lerdal texted Brook: "Hang in there brother. The deal is still the best option."[278] The two then exchanged an additional fourteen messages.

- When Brook Taube suggested that the "predictable naysayers" would be the first people removed from their positions during the Proposed Transactions, Lerdal was quick to support the idea, texting "Freak the naysayers."[279]

- Lerdal requested personal updates by text on the merger behind-the-scenes from Brook, asking "How do we look?" on October 9, 2018. Brook responded that there was "[G]ood news yesterday from [the SEC]" and that the deal was "Read[y] to go when 'advisors' stop fussing."[280]

---

[275] *Id.* at p.4.

[276] *Id.* at p.1.

[277] *Id.* at p.2.

[278] *Id.* at p.4.

[279] *Id.* at p.4.

[280] *Id.* at p.5.

- Lerdal's texts effortlessly wove ingratiating personal adoration with business details. On October 26, 2018, he texted Brook that he had played a game of golf in Brook's honor, and offered "an open invitation to visit and I'll host any time."[281]

- In an August 1, 2017 email, Lerdal complained that the Taube brothers gave the Board "too much information," asserted that the company could not pay him enough to make him continue being diligent and thorough, and bragged about how he would conduct himself in future litigation against the company.[282]

In short, the majority of the members of the Special Committee lacked independence from the Taube brothers.

The Special Committee also sat supine in negotiations concerning the Proposed Transactions, allowing the Taube brothers to dominate the process by: setting the deal structure; controlling the flow of information; withholding information; withholding details about Medley Management's own value and the existence of offers from third parties; locking out "interlopers" through standstill agreements, deal protections, and an aggressive timeline; and rushing the committee's deliberations. In the end, the Special Committee allowed Medley Management to extract a huge premium while Medley Capital stockholders received none.

---

[281] *Id.* at pp.6–7.

[282] JX 023.

The Special Committee deferred to the Taube brothers although the committee had ample negotiating leverage—the ability to terminate the Management Agreement or simply reject the deal, either of which would have had devastating consequences for Medley Management. Terminating the Management Agreement would trigger Fortress's rights under the joint venture. Rejecting the deal would foreclose Medley Management's only viable solution to the enormous financial pressure they labored under.

It bears noting that there is nothing inherently wrong under Delaware law with the structure of the Medley Entities. Most BDCs have corporate structures similar to Medley Capital and Sierra—they rely on external advisors for management, administration, office space, staff, and other aspects of their existence. As a critical counterbalance to management's extensive control over the day-to-day operations, the '40 Act requires that the majority of the directors on BDC boards are independent from management. At no point in time is this protection more critical than in the context of a conflicted transaction. In this case, FrontFour has demonstrated that the Taube brothers are controllers *not* because of flaws inherent in the structure of BDCs, but rather, because those tasked with standing independent from the Taube brothers willfully deferred to their authority.

## 2. The Proposed Transactions Are Not Entirely Fair.

"The concept of fairness has two basic aspects: fair dealing and fair price."[283] Although the two aspects may be examined separately, "the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness."[284] Defendants bear the burden of demonstrating that fair dealing and fair price.[285]

Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[286] "The scope of this factor is not limited to the controller's formal act of making the proposal; it encompasses actions taken by the controller in the period leading up to the formal proposal."[287] "Particular consideration must be given to evidence of whether the

---

[283] *Weinberger*, 457 A.2d at 711.

[284] *Id.*

[285] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (defendants must prove "to the *court's* satisfaction that the transaction was the product of both fair dealing and fair price" (emphasis original) (internal quotation marks omitted)).

[286] *Id.* at 1162 (citing *Weinberger*, 457 A.2d at 711).

[287] *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *26 (Del. Ch. Aug. 27, 2015).

special committee was truly independent, fully informed and had the freedom to negotiate at arm's length."[288]

In this case, the timing, structure, initiation, and negotiation of the Proposed Transactions were conceived for the purpose of—and did—advance the Taubes' interest at the expense of Medley Capital's other stockholders. In the events leading up to the Proposed Transactions, the Taube brothers created an informational vacuum, which they then exploited. The Special Committee was not truly independent and did not negotiate at arm's length. In sum, Defendants have not proven that the Proposed Transactions were the product of fair dealing.

The second aspect of the entire fairness inquiry is fair price. Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[289]

---

[288] *Lynch*, 638 A.2d at 1120–21. *See also In re Tele–Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727, at \*10 (Del. Ch. Dec. 21, 2005) ("[A]n important element of an effective special committee is that it be fully informed in making its determination."); *Tremont II*, 694 A.2d at 431 ("In evaluating this claim the Court of Chancery correctly stated that "[a] controlling shareholder . . . must disclose fully all material facts and circumstances surrounding the transaction.") (citing *Kahn v. Tremont Corp.* (*Tremont I*), 1996 WL 145452, at \*15 (Del. Ch. Mar. 21, 1996)).

[289] *Lynch*, 638 A.2d at 1115 (*citing Weinberger*, 457 A.2d at 711).

The primary evidence presented at trial on the issue of fair price consists of the opinions of the parties' respective experts.[290] Defendants offered the testimony of Dr. Marc Zenner, who performed regression analyses intended to show the benefits of size/scale, asset quality, and internalized management.[291] That analysis did not support the propositions for which it was offered. One analysis explained only 11% of the variation in p/NAV multiples.[292] The other was not statistically significant and lacked explanatory power.[293] Zenner also conducted a comparable transactions analysis, but 50% of his "transactions" were offers that never resulted in an actual merger.[294] Zenner did not opine on the value of Medley Capital, a fair price to acquire Medley Capital, or the value of the combined company if the Proposed Transactions were to occur. He opined that the process used by various investment banks was reasonable, but an expert cannot simply vouch for the work of someone else.[295] Zenner opined that Medley Capital's trading price following the

---

[290] *See* Trial Tr. at 427:3–502:21 (Zenner examination); JX 618 (Zenner Report); Trial Tr. at 94:6–152:20 (Kennedy examination); JX 621 (Kennedy Report).

[291] JX 621 (Kennedy Report).

[292] Trial Tr. at 475–76 (Zenner).

[293] *Id*. at 474–75.

[294] *Id.* at 491–92.

[295] *See, e.g.*, *Va. Power Energy Mktg., Inc. v. EQT Energy, LLC*, 2012 WL 13034278, at *1 (E.D. Va. May 9, 2012) (holding that a "comment upon the opinion of another expert . . . is not a proper subject for expert opinion evidence").

announcement of the proposed transaction supported a finding of fair price. Zenner, however, was unable to exclude other possible causes of Medley Capital's stock price bump in response the Proposed Transactions.[296]

By contrast, FrontFour's expert Dr. William Kennedy credibly testified that the fair value of Medley Capital is $5.07 per share and the price being offered is well below that.[297]

Ultimately, this is a case in which a deeply flawed process obscures the fair value of Medley Capital. The record reveals that the Taube brothers obstructed any pre-signing price competition from "interlopers."[298] The two aspects of the entire fairness standard interact.[299] Just as "[a] strong record of fair dealing can influence the fair price inquiry, . . . process can infect price."[300] Any inability to determine the

---

[296] Trial Tr. at 488:3–8 (Zenner).

[297] Trial Tr. at 96–98, 103–111 (Kennedy).

[298] *In re Appraisal of Dell Inc.*, 2016 WL 3186538, at \*36 & n.36 (Del. Ch. May 31, 2016) ("[T]he bulk of any price competition occurs before the deal is signed."), *aff'd in part, rev'd in part sub nom. Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd*, 177 A.3d 1 (Del. 2017).

[299] *Dole*, 2015 WL 5052214, at \*34.

[300] *Reis*, 28 A.3d at 467; *accord Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2014 WL 4374261, at \*33 (Del. Ch. Sept. 4, 2014) ("Robust procedural protections may support a determination that price was fairly within a range of reasonable values, and a failure of process may prevent a Court from reaching such a conclusion."); *see William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011) ("Merely showing that the sale price was in the range of fairness, however, does not necessarily satisfy the entire fairness burden when fiduciaries stand on both sides of a transaction and manipulate the sales process.");

degree to which the flawed process infected the price works to Defendants' detriment, as they bear the burden of proof on this issue.[301]

## B. Enhanced Scrutiny Claim

The parties engaged in a robust dispute concerning whether deal protections or the Proposed Transactions in their entirety are subject to and pass enhanced

_Gentile v. Rossette_, 2010 WL 2171613, at *9 (Del. Ch. May 28, 2010) ("From a tainted process, one should not be surprised if a tainted price emerges."); _Bomarko, Inc. v. Int'l Telecharge, Inc._, 794 A.2d 1161, 1183 (Del. Ch. 1999), _as revised_ (Nov. 16, 1999), _aff'd_, 766 A.2d 437 (Del. 2000) ("[T]he unfairness of the process also infects the fairness of the price."); _HMG/Courtland Properties, Inc. v. Gray_, 749 A.2d 94, 116 (Del. Ch. 1999) (holding that the defendants did not satisfy their burden by showing that the price was "within the low end of the range of possible prices that might have been paid in negotiated arm's-length deals" where "[t]he process was . . . anything but fair"); _Tremont II_, 694 A.2d at 432 ("[H]ere, the process is so intertwined with price that under _Weinberger_'s unitary standard a finding that the price negotiated by the [special committee] might have been fair does not save the result.").

[301] _Auriga Capital Corp. v. Gatz Props._, 40 A.3d 839, 857–58 (Del. Ch. 2010), _aff'd_ 59 A.3d 1206 (Del. 2012). _See also id._ at 874–75 ("[The defendant] has argued throughout this litigation that [the property] was worth less than its debt and thus any surplus over zero was a fair price, but I cannot accept this as true based on the record before me. [The defendant] himself is responsible for this evidentiary doubt. He fended off [a potential buyer], gave incomplete information to [the appraiser hired by the LLC], and did not promote a fair Auction process. Thus, I do not view the Auction process as generating a price indicative of what [the property] would fetch in a true arm's-length negotiation. Rather, the evidence suggests that [the property] was worth more than what [the defendant] paid. [The defendant] was not motivated to bid his best price because he knew that he was the only bidder before he finalized his offer . . . The fact that we do not have concrete evidence of what a fully negotiated third-party deal would have produced is [the defendant's] own fault, and such ambiguities are construed against the self-conflicted fiduciary who created them.").

70

scrutiny.[302]   Any Delaware law enthusiast would relish the opportunity to dilate on the issues raised, but the press of time requires a more direct approach.

FrontFour challenges three deal protections in the Merger Agreement: a no-shop, an adverse-recommendation-change requirement, and a termination fee.[303] Enhanced scrutiny applies to deal protections, and the burden lies on Defendants to justify those protections.[304]   Defendants cannot meet that burden here.

_____

[302] FrontFour urges the Court to apply enhanced scrutiny to the entirety of the Proposed Transactions, not just the deal protections.  They argue that, "as conceived, the entire Transaction is an improper defensive measure implemented by [Medley] Management to advance its own interests . . . ."  Pls.' Post-Trial Br. at 65.

[303] More specifically, the deal protections are: (1) a no-shop provision preventing each party from attempting to undermine the Merger Agreement by soliciting other bids, subject to a "Superior Proposal" fiduciary out; (2) an "adverse recommendation change" requirement that the Medley Capital Board recommend that the stockholders vote in favor of the merger, subject to a fiduciary out; and (3) a "termination fee" provision requirement the payment of $6 million to Sierra under certain conditions.  Defendants' expert quantifies the termination fees as 2.79% of the deal value, and FrontFour does not dispute this computation.  JX 618 at p.31.

[304] *See Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1151 (Del. 1989); *Mills Acq. Co. v. Macmillan Inc.*, 559 A.2d 1261, 1288 (Del. 1988).  "Deal protections" are provisions of a merger agreement that compensate a jilted third party if the target does not consummate the deal or obstructs disruption of the deal by another transaction.  Leo E. Strine, Jr., *Categorical Confusion: Deal Protection Measures in Stock-for-Stock Merger Agreements*, 56 Bus. Law. 919, 922 (2001) [hereinafter *Categorical Confusion*].  Under default rules of the Delaware General Corporation Law, a stockholder can sell control of the company in the minimum number of days permitted under federal securities law.  *Id.* at 924 & n.14.  Deal protection measures disturb this natural ordering by obstructing a stockholders' ability to engage in other transactions once a merger agreement is signed. Further, mergers require stockholder approval.  To be effective, the stockholder vote must be "meaningful and voluntary."  *See* 8 *Del. C.* § 251(c).  By safeguarding the merger, deal

The suite of deal protections at issue would pass muster under most circumstances, but not in this case. The Court's analysis is fact intensive and context specific.[305] Due to extreme process flaws that led to the Proposed Transactions, the deal protections are not within the range of reasonableness.[306]

Of the three challenged deal protections, the no-shop is the primary offender. No-shop provisions paired with a fiduciary out are not unique.[307] No-shop

protections encroach on the voluntary nature of the stockholder vote. *Williams v. Geier*, 671 A.2d 1368, 1387 (Del. 1996).

[305] *La. Mun. Police Emps.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1181 n.10 (Del. Ch. 2007) ("The inquiry, by its very nature fact intensive, cannot be reduced to a mathematical equation."); *id.* ("Our courts do not 'presume that all business circumstances are identical or that there is any naturally occurring rate of deal protection, the deficit or excess of which will be less than economically optimal. . . . [A] court focuses upon the real world risks and prospects confronting [directors] when they agreed to the deal protections.") (internal quotation marks and citation omitted); *see also In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *8 (Del. Ch. Oct. 16, 2013) ("a no-solicitation provision, a poison pill, a reasonable termination fee, information rights, and a top-up option . . . *in the context of an otherwise reasonable sales process*, have been found non-preclusive" (emphasis added)); *In re Cogent, Inc. S'holder Litig.*, 7 A.3d 487, 501–09 (Del. Ch. 2010) (assessing the preclusive effect of deal protections individually and "in the aggregate"); *Orman v. Cullman*, 2004 WL 2348395, at *6 (Del. Ch. Oct. 20, 2004) (noting that deal protection devices may be unreasonable even if not coercive or preclusive); *Stahl v. Apple Bancorp, Inc.*, 16 Del. J. Corp. L. 1573, 1587 (Del. Ch. Aug. 9, 1990) (Allen, C.) ("Thus, where it is applicable, *Unocal* requires a judicial judgment finely focused upon the particulars of the case.").

[306] *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 935 (Del. 2003).

[307] *See, e.g.*, *In re Cogent*, 7 A.3d at 502 & n.40 (collecting decisions) ("Potential suitors often have a legitimate concern that they are being used merely to draw others into a bidding war. Therefore, in an effort to entice an acquirer to make a strong offer, it is reasonable for a seller to provide a buyer some level of assurance that he will be given adequate opportunity to buy the seller, even if a higher bid later emerges.").

provisions are used to entice acquirers to make a strong offer by contractually eliminating the risk that the acquirer is a stalking horse used to generate a bidding war.[308] That justification has no application here. The Proposed Transactions are among affiliated entities. All of the parties were aware, when negotiating the deal protections, that there was no pre-signing auction or market check and no risk that Sierra was being used as a stalking horse. There was also no risk that Medley Capital would lose the "bird in hand" if the transaction was shopped.[309]

Incrementally, the other two deal protections are also problematic. The adverse-recommendation-change provision[310] unduly cabins the Board.[311] Although

---

[308] *Id.* at 502.

[309] Interestingly, Defendants' expert, Dr. Marc Zenner, presented a comparable transactions analysis related to deal protection devices. In that analysis two-thirds of his comparable set involved a pre-signing formal auction. Of course, this renders the set *not* comparable to the Proposed Transactions. Trial Tr. at 494–95. It also supports the notion that no-shops are outside of the range of reasonableness absent a pre-signing market canvas or efforts to assess potential price competition pre-signing. *See Forgo v. Health Grades, Inc.*, C.A. No. 5716-VCS, at 16:18–20 (Del. Ch. Sept. 3, 2010) (TRANSCRIPT) ("Well, you know, if you're not going to do as much on the front end, you got to make sure the back end works.").

[310] Merger Agr. § 7.10(e).

[311] *See generally In re Complete Genomics, Inc. S'holder Litig.*, C.A. No. 7888-VCL, at 17 (Del. Ch. Nov. 9, 2012) (TRANSCRIPT) (stating that placing restrictions on a board's "ability to change its recommendation" that mirror "the types of conditions and procedures frequently and historically used to regulate a target's contractual ability to terminate a merger agreement and accept a superior proposal" is "fraught with peril"). This Court provided a definitive summary of the relevant issues in *In re Primedia, Inc. Shareholders Litigation*:

the termination fee is not unreasonable on its own, in combination with the other

deal protections, it too falls outside the range of reasonableness.[312]

## C.    Disclosure Claims

"[T]o establish a violation of the duty of disclosure, [a plaintiff] must prove

that the omitted fact would have been material to the stockholder action sought."[313]

The materiality standard requires that fiduciaries disclose all facts which "under all

the circumstances . . . would have assumed actual significance in the deliberations

---

Delaware law requires that a board of directors give a meaningful, current recommendation to stockholders regarding the advisability of a merger including, if necessary, recommending against the merger as a result of subsequent events.  This obligation flows from the bedrock principle that when directors communicate publicly or directly with shareholders about corporate matters, the *sine qua non* of directors' fiduciary duty to shareholders is honesty.  The duty of loyalty, which mandates that directors act in stockholders' best interests, consequently requires ensuring an informed stockholder vote.  The obligation to change as recommendation prior to a stockholder vote can be further viewed as a duty to update a prior material statement.  A board may not suggest or imply that it is recommending the merger to the shareholders if in fact its members have concluded privately that the deal is not now in the best interest of the shareholders. ***In light of these principles, the target board must have an ability to make a truthful and candid recommendation consistent with its fiduciary duties—and this duty will be applicable whether or not there is a superior offer.***"

67 A.3d 455, 491–92 (Del. Ch. 2013) (internal quotations and citations omitted) (emphasis added).

[312] *See In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 840 (Del. Ch. 2011) (enjoining defensive measures not because the defensive measures themselves failed enhanced scrutiny but because they were "the product of a fiduciary breach").

[313] *Unanue v. Unanue*, 2004 WL 2521292, at *10 (Del. Ch. Nov. 3, 2004).

of the reasonable shareholder."[314]  "A material fact is one that a reasonable stockholder would find relevant in deciding how to vote.  It is not necessary that a fact would change how a stockholder would vote."[315]  "A material fact is one that a reasonable investor would view as significantly altering the 'total mix' of information made available."[316]  However, once fiduciaries have "traveled down the road of partial disclosure," they must "provide the stockholders with an accurate, full, and fair characterization of [the] events."[317]

Controlling stockholders "have large informational advantages that can only be imperfectly overcome by the special committee process, which almost invariably involves directors who are not involved in the day-to-day management of the subsidiary."[318]  Accordingly, controllers owe "a duty of complete candor when

---

[314] *In re Novell, Inc. S'holder Litig.*, 2013 WL 322560, at *13 (Del. Ch. Jan. 3, 2013) (citation omitted).

[315] *Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150, 156 (Del. 1997) (footnotes omitted).

[316] *Zaucha v. Brody*, 1997 WL 305841, at *5 (Del. Ch. June 3, 1997); *see Novell*, 2013 WL 322560, at *13 (explaining that material facts are those which, "under all the circumstances . . . would have assumed actual significance in the deliberations of the reasonable shareholder." (citation omitted)).

[317] *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1280 (Del. 1994); *see also Rodgers v. Bingham*, C.A. No. 2017-0314-AGB, at 81 (Del. Ch. June 1, 2017) (TRANSCRIPT).

[318] *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 450 (Del. Ch. 2002).

standing on both sides of a transaction and must disclose fully all the material facts and circumstances surrounding the transaction."[319]

Applying these principles, FrontFour has proven that Defendants violated their duties of disclosure to inform stockholders of the process that led to the Proposed Transactions and the expressions of interest from third parties.

### 1. Process Disclosures

The Proxy describes the deployment of three different special committees to mitigate conflicts and replicate arm's-length bargaining.[320] The description creates the misleading impression that the Special Committee process at Medley Capital was effective. In reality, during the negotiation process, the Special Committee was disabled by its ignorance of: the details of the bids made for Medley Management during Project Elevate; the "enormous pressure" facing Medley Management and the Taubes;[321] and the standstill agreements that forbade potential transaction partners from presenting proposals directly to Medley Capital without Medley

---

[319] *Kahn v. Lynch Commc'n Sys., Inc.*, 669 A.2d 79, 88 (Del. 1995).

[320] *See* JX 430 at 72–73.

[321] *See Morrison v. Berry,* 191 A.3d 268, 287–88 (Del. 2018), *as revised* (July 27, 2018) (reversing trial court's dismissal of disclosure claim after concluding that "stockholders were entitled to know the depth and breadth of the pressure confronting the Company" given "the Company chose to speak on the topic").

Management's consent. These process failures and others identified in this decision are material to stockholders considering the Proposed Transactions.

The Proxy and Medley Capital's other public filings disclose certain of these process flaws now, but they fail to mention that the Special Committee only learned of these items after the execution of the Merger Agreement (and in some cases only after this litigation began).[322] The timing of the Board's knowledge is a critical fact that would impact any stockholder's assessment of the quality of the transaction process.[323]

### 2. Other Indications of Interest—Lantern, NexPoint, Origami, and ZAIS

Following FrontFour's January 30, 2019 letter to the Medley Capital Board,[324] Medley Management disclosed on February 5, 2019 certain terms of eleven

---

[322] *See* Trial Tr. at 203–217 (Ainsberg); *id*. 409–416 (Hirtler-Garvey); JX 628 at pp.13–15.

[323] *See In re Rural Metro*, 88 A.3d 54, 94 (Del. Ch. 2014) (concluding after a trial that, at the time they approved the transaction, the [directors] were unaware of RBC's last minute efforts to solicit [a] buy-side financing role from Warburg . . . and did not know about RBC's manipulation of its valuation metrics," and holding that, "[u]nder the circumstances, the Board's decision to approve Warburg's bid lacked a reasonable informational basis and fell outside the range of reasonableness."); *In re Del Monte Foods Co. S'holders Litig.*, 2011 WL 2535256, at *10 (Del. Ch. June 27, 2011) (fee award opinion emphasizing that lead counsel "uncovered facts not previously known to the [target] board" that "empowered the [target] directors to re-evaluate their prior decisions and reliance on [their financial advisor]").

[324] JX 706.

indications of interest. It characterized each as a "non-binding indication of interest received by Medley Management."[325] Medley Capital separately issued supplemental disclosures regarding offers made by NexPoint on January 31, 2019, to replace Medley Management as manager, and Origami on February 11, 2019, to acquire Medley SBIC.

Defendants never disclosed to stockholders that Lantern had expressed interest in a recapitalization transaction with Medley Capital, or that Lantern had executed a standstill agreement with Medley Management that prohibited it from making its recapitalization proposal directly to Medley Capital.[326]

Defendants also never disclosed ZAIS's January 2, 2019 proposal to replace Medley Management as Medley Capital's investment advisor for the "explicit task of managing an orderly sale or liquidation of Medley Capital."[327] Nor have Defendants disclosed Brook Taube's January 24, 2019 rejection of ZAIS's proposal on behalf of Medley Capital, citing the non-solicitation provision in the Medley Capital Merger Agreement.[328] Text message correspondence between Brook Taube

---

[325] JX 513 at pp.3–4.

[326] JX 138 at p.4; Trial Tr. at 340–43 (Taube).

[327] JX 432.

[328] JX 459.

and Lerdal on the day of the Special Committee's January 9, 2019 meeting shows that Medley Management coordinated with the Special Committee regarding whether and how to respond to ZAIS. None of this was disclosed. [329]

Stockholders cannot make a fully informed decision regarding the Proposed Transactions unless they know about Lantern's expressed interest in a recapitalization, the ZAIS proposal, and Brook Taube's response citing the Medley Capital Merger Agreement. [330]

Further, on February 13, 2019, Defendants publicly denied that Medley Management received an offer from Origami to purchase Medley SBIC in April 2018. [331] Medley Capital's February 13 press release stated: "Contrary to Origami's public statements, the Company never received a proposal to buy the SBIC Subsidiary from Origami until yesterday. Origami did not propose to buy the equity of the SBIC subsidiary for 60% of its fair market value or at any price last April as

---

[329] *See* Trial Tr. at 366 (Taube); JX 717 at p.11 ("Proper response forthcoming . . . Are we going to have to respond to every f**ksake on the planet?").

[330] *See In re Topps Co.*, 926 A.2d 58, 77 (Del. Ch. 2007) (issuing an injunction after finding that proxy statement misrepresented competing bidder's acquisition proposals and failed to disclose CEO's potentially bid-deterring statements to the market).

[331] JX 553 at p.3.

suggested by Origami's press release."[332]  This disclosure creates the impression that Origami fabricated the fact of the proposal.

Origami did not fabricate the fact of the proposal.  In fact, Medley Capital received an April 11, 2018 letter from Origami addressed to Brook Taube and Marilyn Adler, Senior Managing Director, Medley Capital, expressing "interest in purchasing 100% of Medley Capital Corporation and its affiliates' interest in Medley SBIC."[333]  Adler responded, dispelling any notion that the email failed to transmit.[334] Whether Brook Taube never saw Origami's proposal, as he contends, is irrelevant to the truth: Medley Management received it.  "Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, . . . the *sine qua non* of directors' fiduciary duty to shareholders is honesty."[335]  Medley Capital must correct its disclosures regarding Origami.[336]

---

[332] *Id.*

[333] JX 100.

[334] JX 108 ("I am excited to tell you that Medley has agreed to discuss a process for the sale.  I've given your name as a possible buyer.  I am having a discussion this week and will update you as I know more."); Trial Tr. at 374–75 (Taube).

[335] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998).

[336] *In re Topps Co.*, 926 A.2d at 77 (issuing injunction after finding that proxy statement misrepresented competing bidder's acquisition proposals).

## D.    Aiding and Abetting

To establish an aiding and abetting claim against Sierra, FrontFour was required to prove that Sierra *knowingly participated* in the other Defendants' breach of fiduciary duty.[337]  This is "a stringent standard that turn[s] on proof of scienter."[338] FrontFour bears the burden for the aiding and abetting claim.[339]

"The adjective 'knowing' modifies the concept of 'participation,' not breach."[340]  The underlying wrong does not have to be knowing or intentional; it can be a breach of the duty of care.[341]  Under Section 876(b) of the Restatement (Second) of Torts, knowing participation exists when a third party:

> (a) does a tortious act in concert with the other or pursuant to a common design with him, or

---

[337] *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (setting out the elements of an aiding and abetting claim).

[338] *In re MeadWestvaco S'holders Litig.*, 168 A.3d 675, 688 (Del. Ch. 2017) (alteration in original) (internal quotation marks omitted); *see Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006).

[339] *Dole*, 2015 WL 5052214, at *3.

[340] *Rural Metro*, 88 A.3d at 97.

[341] *Singh v. Attenborough*, 137 A.3d 151, 152–53 (Del. 2016) (ORDER); *see RBC Capital Markets LLC v. Jarvis*, 129 A.3d 816, 862 (Del. 2015) (affirming imposition of liability on financial advisor who aided and abetted the board's breach of its duty of care).  *See generally* Restatement (Second) of Torts § 876 cmt. d (1979) (explaining that secondary liability can attach where the underlying breach "is merely a negligent act" and "applies whether or not the [underlying wrongdoer] knows his act is tortious").

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.[342]

For purposes of a board decision, the requirement of participation can be established if the third party "participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue."[343] In particular, a third party can be liable for aiding and abetting a breach of the duty of care if the third party "purposely induced the breach of the duty of care . . . ."[344] The

---

[342] Restatement (Second) of Torts § 876(b) (1979); *see In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *47–50 (Del. Ch. Oct. 16, 2018); *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *2–3 (Del. Super. Nov. 30, 2004).

[343] *Malpiede*, 780 A.2d at 1098.

[344] *RBC Capital*, 129 A.3d at 842 (upholding finding of aiding and abetting where financial advisor inexplicably modified its precedent transaction analysis); *In re Wayport Litig.*, 76 A.3d 296, 322 n.3 (Del. Ch. 2013) ("[A] non-fiduciary aider and abettor could face different liability exposure than the defendant fiduciaries if, for example, the non-fiduciary misled unwitting directors to achieve a desired result."); *Del Monte*, 25 A.3d at 836 (holding that investment bank's knowing silence about its buy-side intentions, its involvement with the successful bidder, and its violation of a no-teaming provision misled the board); *Goodwin v. Live Entm't, Inc.*, 1999 WL 64265, at *28 (Del. Ch. Jan. 25, 1999) (granting summary judgment in favor of defendants charged with aiding and abetting a breach of the duty of care but suggesting that such a claim could proceed if "third-parties, for improper motives of their own, intentionally duped the Live directors into breaching their duty of care"); *see also Mills Acq.*, 559 A.2d at 1283–84, 1284 n.33 (describing management's knowing silence about a tip as "a fraud on the Board"). *Cf. Singh*, 137 A.3d at 152 ("[A]n advisor whose bad-faith actions cause its board clients to breach their situational fiduciary duties . . . is liable for aiding and abetting."); *Technicolor*, 663 A.2d

method of facilitating the breach can include "creating the informational vacuum" in which the board breaches its duty of care.[345]

A court's analysis of whether a secondary actor "knowingly participated" is necessarily fact intensive. Illustrative factors include the following:

- The nature of the tortious act that the secondary actor participated in or encouraged, including its severity, the clarity of the violation, the extent of the consequences, and the secondary actor's knowledge of these aspects;

- The amount, kind, and duration of assistance given, including how directly involved the secondary actor was in the primary actor's conduct;

- The nature of the relationship between the secondary and primary actors; and

- The secondary actor's state of mind.[346]

---

at 1170 n.25 ("[T]he manipulation of the disinterested majority by an interested director vitiates the majority's ability to act as a neutral decision-making body.").

[345] *Rural Metro*, 88 A.3d at 97 (holding that a party is liable for aiding and abetting when it "participates in the breach by misleading the board or creating the informational vacuum"); *see Mesirov v. Enbridge Energy Co., Inc.*, 2018 WL 4182204, at *15 (Del. Ch. Aug. 29, 2018) (sustaining claim for aiding and abetting against financial advisor for preparing misleading analyses and creating an informational vacuum); *In re TIBCO Software Inc. S'holders Litig.*, 2015 WL 6155894, at *25 (Del. Ch. Oct. 20, 2015) (same); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *48 (Del. Ch. Sept. 4, 2014) (holding that interested director aided and abetted breach of duty by failing to adequately explain valuation, thereby misleading the board and creating an informational vacuum), *aff'd sub nom. Fuchs v. Wren Hldgs., LLC*, 129 A.3d 882 (Del. 2015) (TABLE).

[346] *Dole*, 2015 WL 5052214, at *42.

At trial, FrontFour succeeded in raising suspicions concerning the independence of the Sierra special committee's financial advisor, Broadhaven. Broadhaven's conflicts alone, however, do not prove that Sierra knowingly participated in the other Defendants' fiduciary breach. Broadhaven did act as Sierra's agent, and Sierra knew that Broadhaven had previously worked for Medley Management. But this is the extent of Sierra's *scienter* FrontFour proved at trial. Broadhaven was not "the fiduciary and primary wrongdoer."[347] Nor was Broadhaven a "representative of the [Sierra] who either controls [Sierra] or who occupies a sufficiently high position that [its] knowledge is imputed to [Sierra]."[348]

FrontFour provided no window into the deliberations on the Sierra side of the negotiations to permit the Court to conduct the fact-intensive inquiry demanded. FrontFour did not call any of the Sierra special committee members live or by deposition. FrontFour adduced no evidence that the Taube brothers controlled the Sierra portion of the process or dominated the Sierra board. FrontFour did not brief their aiding and abetting claim before or after trial.[349]

---

[347] *PLX*, 2018 WL 5018535, at *49.

[348] *Id.*

[349] Because FrontFour failed to brief the claim, it was waived. *See In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001) (explaining that a party waived its argument by not raising it in its opening post-trial brief); *Zaman v. Amadeo Hldgs., Inc.*, 2008 WL 2168397,

Accordingly, FrontFour has failed to prove that Sierra aided and abetted in the other Defendants' breaches of fiduciary duties.

**E.     Remedy**

To recap, FrontFour has proven that: Conflicted insiders tainted the process that led to the Proposed Transactions. The Special Committee negotiated with willful blinders, not knowing: the value that third-parties had placed on Medley Management; that Medley Management felt "enormous pressure" to enter into a transaction; that standstill agreements prevented third parties from coming forward; and that Medley Management—not Medley Capital—was shopped in the 2017 sale process on which they relied when determining not to conduct a pre-signing market check. Compounding these problems, the Special Committee agreed to deal protections preventing an effective post-signing market check.

At this stage, the most equitable relief for the Medley Capital stockholders would be a curative shopping process, devoid of Medley Management's influence, free of any deal protections, plus full disclosures. Thereafter, if no better proposal surfaces, the Medley Capital stockholders would have the opportunity to cast a fully

---

at *15 (Del. Ch. May 23, 2008) (explaining that the party waived a defense by failing to raise it in its answer and its pre-trial brief because "[t]hey gave no fair notice").

informed vote for or against the Proposed Transactions.  This relief is precisely what FrontFour seeks.

Yet, ordering such relief would require the Court to blue-pencil Sierra's merger agreement with Medley Capital (and, by implication, its cross-conditioned agreement with Medley Management) so that Medley Capital could solicit additional competing bids in contravention of the no-shop provision.  In other words, FrontFour's requested relief would keep Sierra "on the hook" to purchase Medley Capital in case the "go-shop" process fails to yield a better offer.  Such a revision of the Merger Agreements would deny Sierra the benefit of its bargain and force Sierra to comply with terms to which it never agreed.

Under the Delaware Supreme Court's decision in *C & J Energy*,[350] an injunction may not issue if it would "strip an innocent third party of its contractual rights" under a merger agreement, unless the party seeking the injunction proves that the third party aided and abetted a breach of fiduciary duty by the target directors. FrontFour has failed to prove that Sierra aided and abetted in the breaches of fiduciary duties.  Under these circumstances, *C & J Energy* leaves this Court no

---

[350] 107 A.3d 1049, 1054, 1071–72 (Del. 2014).

discretion—the most equitable remedy for Medley Capital stockholders cannot be granted.

To ensure that Medley Capital stockholders are fully informed on any vote on the Proposed Transactions, FrontFour is entitled to corrective disclosures consistent with this decision, and Defendants are enjoined from consummating the Mergers until such disclosures have been made.[351] FrontFour may also pursue a damages claim by amending their complaint, if FrontFour so chooses.

## III. CONCLUSION

For the foregoing reasons, the Court holds that Medley Capital's directors violated their fiduciary duties in entering into the Proposed Transactions. Medley Capital is ordered to issue corrective disclosures in accordance with this decision and to permit the stockholders sufficient time in advance of any stockholder vote to assimilate the information. Judgment on Counts I and II of the Amended Complaint are entered in favor of FrontFour to the extent set forth in this decision, and judgment

---

[351] *See In re MONY Gp. Inc. S'holder Litig.*, 852 A.2d 9, 32–33 (Del. Ch. 2004) (enjoining a transaction until "necessary supplemental disclosure" is made and noting that because the remedy "can be accomplished quickly, there is no basis to believe that an injunction will result in any harm to . . . the defendants"); *Matador Capital Mgmt. Corp. v. BRC Hldgs., Inc.*, 729 A.2d 280, 300 (Del. Ch. 1998) (enjoining a transaction until "corrective disclosures consistent with the matters discussed herein" were made and disseminated); *see also State of Wisc. Inv. Bd. v. Bartlett*, 2000 WL 193115, at *2 (Del. Ch. Feb. 9, 2000) (enjoining a transaction to provide time for the stockholders "to assimilate information necessary to assure that they may cast an informed vote").

on Count III is entered in favor of Defendants. FrontFour's request to permanently enjoin the Proposed Transactions is denied.[352]

---

[352] The parties have not briefed the issue of class certification and this decision does not resolve it.



# Medley Entities

## Organizational Structure & Conflicted Taube Brothers

**Taube Brothers**
(Brook, Seth & Chris)

Medley Group LLC

Medley Group LLC owns 97.7% of the voting power of MDLY.

**MDLY**
(NYSE)

Step 2: MDLY Merger

**Medley LLC**

Taube Brothers own +66% of Medley LLC

**SIC Advisors**

**SIC**

**MCC Advisors**

**MCC**
(NYSE)

Step 1: MCC Merger

**MDLY**
Brook: co-CEO, co-Chairman
Seth: co-CEO, co-Chairman
Chris: Senior Managing Director, Head of Institutional Fundraising

**MCC Advisors**
Brook: Managing Partner
Seth: Managing Partner

**MCC**
Brook: CEO, CIO, Chairman
Seth: Director

**SIC**
Seth: CEO and Chairman
Brook: Director

***Pro Forma Company***
*Brook: CEO, CIO Chairman*
*Seth: Vice Chairman; Senior EVP & Managing Director*
*Chris: Senior EVP & Managing Director, Head of Institutional Fundraising*

PDX 001
*FrontFour v. MCC*
2019-0100 KSJM

# Medley Entities
## Overlapping Management & Directors

| | Medley Capital Corporation ("MCC") | MCC Advisors LLC ("MCC Advisors") | Medley Management, Inc. ("MDLY") | Sierra Income Corporation ("SIC") | *Pro Forma* Combined Company |
|---|---|---|---|---|---|
| **Brook Taube** | CEO; President; CIO; Board Chairman | Managing Partner; Sr. Portfolio Manager | Co-CEO; Co-Board Chairman | Director | CEO; CIO; Board Chairman |
| **Seth Taube** | Director | Managing Partner | Co-CEO; Co-Board Chairman | CEO; Board Chairman | Vice Chairman; Sr. EVP; Sr. Managing Director |
| **Jeff Tonkel** | Director | Managing Partner | President; Director | President | President |
| **Christopher Taube** | | | Sr. Managing Director; Head-Institutional Fundraising | | Sr. Managing Director; Head-Institutional Fundraising; Sr. EVP |
| **Karin Hirtler-Garvey** | Director; Bd. Special Committee | | | | Director |
| **John Mack** | Director; Bd. Special Committee | | | | Director |
| **Oliver Kane** | | | | Director | Director |
| **Valerie Lancaster-Beal** | | | | Director | Director |
| **Richard Allorto** | CFO; Secretary | CFO | CFO | CFO; Treasurer; Secretary | CFO; Treasurer; Sr. EVP; Sr. Managing Director |
| **John Fredericks** | Chief Compliance Officer | General Counsel; Chief Compliance Officer | General Counsel; Secretary | Chief Compliance Officer | General Counsel; CCO; Secretary; Sr. EVP; Sr. Managing Director |
| **Samuel Anderson** | Sr. Managing Director; Head of Capital Markets & Risk Management | | Sr. Managing Director; Head of Capital Markets & Risk Management | | Sr. EVP; Sr. Managing Director; Head of Capital Markets & Risk Management |
| **Dean Crowe** | Sr. Managing Director; Head of Investing | | Sr. Managing Director; Head of Investing | COO; Sr. Portfolio Manager | |
| **Steven Henke** | Principal | | | Controller | |
| **Mike Szczurek** | Vice President | | | "accountable for the financial reporting, accounting and operations of Sierra Income Corporation" | |

Sources: MCC Schedule 14A, dated December 21, 2018 (Joint Proxy); MCC Form 10-K, dated December 4, 2018;
MCC Advisors Form ADV, filed March 30, 2018;
Website: http://services.corporate-ir.net/SEC.Enhanced/SecCapsule.aspx?c=236906&fid=15945620;
Website: http://www.medleycapitalcorp.com/phoenix.zhtml?c=236906&p=irol-govBio&ID=259515

PDX 005
FrontFour v. MCC
2019-0100 KSJM

# Summary: Standstill Periods

| Potential Bidder | Standstill Execution | Standstill Expiration | Effective as of Merger Announcement? (8/9/18) | Source* |
|---|---|---|---|---|
| PineBridge Investments LLC | 5/9/2018 | 5/9/2019 | Yes | JX929 |
| NewStar Financial Inc. | 12/22/2017 | 1/22/2019 | Yes | JX928 |
| Kayne Anderson Capital Advisors LP | 12/13/2017 | 12/13/2018 | Yes | JX927 |
| Pretium Partners LLC | 11/28/2017 | 11/28/2019 | Yes | JX926 |
| Sound Point Capital Management LP | 11/20/2017 | 11/20/2018 | Yes | JX925 |
| Tikehau Capital | 11/17/2017 | 11/17/2018 | Yes | JX924 |
| GSO Capital Partners LP | 11/16/2017 | 2/16/2019 | Yes | JX923 |
| Assicurazioni Generali S.p.A. | 11/15/2017 | 11/15/2018 | Yes | JX922 |
| CVC Credit Partners LLC | 11/15/2017 | 11/15/2018 | Yes | JX921 |
| Barings LLC | 11/9/2017 | 11/9/2018 | Yes | JX919 |
| American Century Services LLC | 11/9/2017 | 11/9/2018 | Yes | JX920 |
| Ares Management LP | 11/8/2017 | 11/8/2018 | Yes | JX918 |
| Tennenbaum Capital Partners LLC | 11/7/2017 | 11/7/2018 | Yes | JX917 |
| Pacific Investment Management | 11/6/2017 | 11/6/2018 | Yes | JX915 |
| Schroder Investment Management | 11/6/2017 | 11/6/2018 | Yes | JX916 |
| Flexpoint Ford LLC | 11/3/2017 | 11/3/2018 | Yes | JX912 |
| TA Associates Management LP | 11/3/2017 | 11/3/2018 | Yes | JX913 |
| Apollo Management Holdings LP | 11/3/2017 | 11/3/2018 | Yes | JX914 |
| Lightyear Capital LLC | 11/2/2017 | 11/2/2018 | Yes | JX911 |
| Bain Capital Credit LP | 11/1/2017 | 11/1/2018 | Yes | JX909 |
| GTCR LLC | 11/1/2017 | 11/1/2018 | Yes | JX910 |
| The TCW Group Inc. | 10/31/2017 | 10/31/2019 | Yes | JX907 |
| Stone Point Capital LLC | 10/31/2017 | 10/31/2018 | Yes | JX908 |
| Adams Street Credit Advisors LP | 10/26/2017 | 10/26/2018 | Yes | JX906 |
| Carlyle GMS Investment Management LLC | 7/25/2017 | 10/25/2018 | Yes | JX905 |
| Kohlberg Kravis Roberts & Co LP | 7/21/2017 | 7/21/2018 | No | JX904 |
| First Eagle | 7/10/2017 | 1/10/2019 | Yes | JX903 |
| Benefit Street Partners LLC | 7/7/2017 | 7/7/2018 | No | JX902 |
| Investcorp Credit Management US LLC | 6/27/2017 | 6/27/2019 | Yes | JX901 |
| Ashmore Group plc | 6/23/2017 | 6/23/2019 | Yes | JX900 |

\* Based on information to Plaintiffs in Defendants' production.

PDX 006

FrontFour v. MCC
2019-0100 KSJM

# Summary: Standstill Periods



**UBS and Credit Suisse Outreach** — 6/23/17

**Goldman Outreach** — 10/26/17

**MCC Special Committee Meeting** — 6/19/18

**Merger Announced** — 8/9/18

— 3/7/19

— 11/28/19

Ashmore Group plc
Investcorp Credit Management US LLC
Benefit Street Partners LLC
First Eagle
Kohlberg Kravis Roberts & Co LP
Carlyle GMS Investment Management LLC
Adams Street Credit Advisors LP
Stone Point Capital LLC
The TCW Group Inc.
GTCR LLC
Bain Capital Credit LP
Lightyear Capital LLC
Apollo Management Holdings LP
TA Associates Management LP
Flexpoint Ford LLC
Schroder Investment Management
Pacific Investment Management
Tennenbaum Capital Partners LLC
Ares Management LP
American Century Services LLC
Barings LLC
CVC Credit Partners LLC
Assicurazioni Generali S.p.A.
GSO Capital Partners LP
Tikehau Capital
Sound Point Capital Management LP
Pretium Partners LLC
Kayne Anderson Capital Advisors LP
NewStar Financial Inc.
PineBridge Investments LLC

■ **Standstill Effective Period**

*\* Based on information to Plaintiffs in Defendants' production. Sources listed in PDX 006.*

PDX 007

*FrontFour v. MCC*
2019-0100 KSJM

SC-D-01

# MCC Special Committee Meetings Between Retention of Sandler O'Neill and Announcement of Merger

| Date of Meeting | Kramer attended? | Sandler attended? | Sandler presentation? |
|---|---|---|---|
| July 11, 2018 | ✓ (JX209) | ✓ | ✓ (JX208) |
| July 17, 2018 | ✓ (JX225) | ✓ | ✓ (JX223) |
| July 18, 2018 | ✓ (JX229) | ✓ | ✓ (JX228) |
| July 20, 2018 | ✓ (JX236) | ✓ | ✓ (JX235) |
| July 23, 2018 | ✓ (JX248) | ✓ | ✓ (JX247) |
| July 26, 2018 | ✓ (JX259) | ✓ | ✓ (JX257) |
| July 27, 2018 | ✓ (JX268) | ✓ | ✓ (JX266) |
| July 28, 2018 | ✓ (JX279) | ✓ | ✓ (JX278) |
| August 2, 2018 | ✓ (JX295) | ✓ | ✓ (JX640) |
| August 6, 2018 | ✓ (JX308) | ✓ | |
| August 8, 2018 | ✓ (JX321) | ✓ | ✓ (JX319) |
| August 9, 2018 | ✓ (JX335) | ✓ | ✓ (JX333) |